[No. F032595. Fifth Dist. Dec. 18, 2000.]

THE PEOPLE, Plaintiff and Respondent, v.
DANIEL LEE BUTLER, Defendant and Appellant.

[No. F034390. Fifth Dist. Dec. 18, 2000.]

In re DANIEL LEE BUTLER on Habeas Corpus.

**[Opinion certified for partial publication.†]**

†Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of parts II, III, and IV.

748

**COUNSEL**

Jill D. Lansing, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Robert R. Anderson, Assistant Attorney General, W. Scott Thorpe, Harry Joseph Colombo and Troy L. Nunley for Plaintiff and Respondent.

**OPINION**

**WISEMAN, J.**—Defendant was convicted by a jury of burglary (count I; Pen. Code,[1] § 459), assault with a deadly weapon (count II; § 245, subd. (a)), making terrorist threats (count IV; § 422) and two misdemeanor violations of battery (counts V & VI; § 242). By bench trial, the court found true the allegations that defendant had suffered a serious prior felony conviction, attempted robbery, within the meaning of the three strikes law (§ 667, subd. (d)) and section 667, subdivision (a), and had served a prior prison term for that conviction within the meaning of section 667, subdivision (b). Defendant was sentenced to prison for 13 years. In the published portion of defendant's appeal, we reject defendant's attacks on the sufficiency of the evidence and the jury instructions regarding the charge of making a terrorist threat.

### Factual History

On March 17, 1998, Kelly Mendoza lived in an apartment complex in Modesto with her husband and their two children, a one-year-old daughter

---

[1] All statutory references are to the Penal Code unless otherwise noted. Defendant's brother, David Butler, was charged as a codefendant in counts I, II, and VI. Count III charged a felony assault against David Butler only, and defendant was charged alone in counts IV and V. David Butler pled guilty, whereas defendant proceeded to a jury trial.

and a five-year-old son. Kelly was three months pregnant at the time. About noon that day, Kelly was in the laundry room of the complex and spoke to defendant's mother about vandalism at the complex. Kelly complained that her son had been cut on the foot while walking on the sidewalk by some beer bottles defendant and his twin brother, David, had broken. Defendant was present in the laundry room and told Kelly it was none of her "fucking business." When Kelly told defendant to wait until her husband got home, defendant stated he was going to beat her husband with a baseball bat. Kelly called the landlady from her apartment and told her what had happened. The landlady then posted something on defendant's apartment door.

About 3:00 p.m. that afternoon, after Andy Mendoza, Kelly's husband, got home, a bunch of "gang banger teenagers" were outside his apartment. Defendant, David and defendant's teenage friends banged on the Mendozas' glass patio door, calling Kelly a bitch and threatening to kill the family. Kelly noticed that one of defendant's friends had a crowbar. Andy described it as a black metal club. Kelly's children began to cry and she called the 911 operator. However, the group dispersed when the police arrived. After the police left the area, the group returned about 4:30 p.m., and again tormented the Mendozas. Andy was terrified—he was afraid to leave his house for fear defendant and his gang would come into his apartment and hurt his wife.

Later that evening Kelly and Andy went to Juan and Virginia Seaberry's apartment, about three doors down, to attend a prayer meeting and pray about the problems they were having with the Butlers. Virginia was aware the Mendozas, fellow parishioners, were having problems with the Butlers and were afraid, and invited them to pray. Phil Henderson and Steve Seaberry arrived at the Seaberry apartment shortly after the Mendozas. Kelly realized she had forgotten her purse, so she and Virginia went to Kelly's apartment to retrieve it. Kelly noticed defendant, David and their friends standing outside. Kelly ran into her apartment to get her purse. When she came out, she saw defendant grab Virginia's arm and curse at her. Kelly walked back to Virginia's apartment and told Virginia to come with her.

Virginia testified that defendant and David stood in front of her, and some of defendant's friends had surrounded her. In total, there were about five or six individuals. Defendant grabbed her arm and told her she should mind her own business, that his gang, "El Norte," owned the apartments. Defendant called Virginia "a fucking bitch," and again told her she needed to mind her own business or she "was going to get hurt." Virginia felt very intimidated because the group had followed her and surrounded her while she was alone; she perceived defendant's statement as a threat; and she was afraid they would hurt her. She tried to calm the situation by telling defendant that the

Mendozas had come over to her house just for a prayer meeting and not for a conflict with defendant. However, as she walked back home when Kelly came out, the group followed to the door of her apartment.

With assistance from the people inside the apartment, Kelly and Virginia entered the apartment and attempted to close the door. Defendant and his brother blocked the doorway so the door could not be shut, and their friends stood behind them. Defendant told Kelly, "We're Nortenos . . . . These are our apartments." "You're outta here. You fucking bitch." They also threatened to return and shoot Kelly and her friends with a gun. Juan and Virginia asked defendant and his group to move so they could shut the door. Andy and Juan then tried to shut the door but could not do so. Virginia heard the group say they wanted Kelly, and if they gave her to them the situation would be resolved.

Shortly after, one of the twins hit Steve Seaberry in the face and he fell back. Defendant, David and their gang then rushed into the apartment, pushing Juan and causing his three-year-old daughter, Samantha, to fall to the floor. All the occupants backed away, but one of the Butler twins slapped Phil Henderson. The occupants continued to avoid a confrontation, hoping the intruders would go away; however, the gang continued their assault. Defendant pulled out a knife and went toward Andy, who backed up to the corner of the living room. Defendant was about a foot away from Andy when he first flashed the knife. Defendant subsequently came within eight inches of Andy, while pointing the knife in a threatening manner as though he were going to lunge at Andy with it. David hit Andy and then defendant dropped the knife as he and David began punching Andy together. Andy attempted to defend himself for awhile and then retreated to the rear of the apartment to hide.

Defendant turned his attention to Steve, and began punching him in the face. Steve did not defend himself, but tried to cover up his face and prayed. He told defendant, "Stop, stop, I'm a preacher, don't do that," and defendant hit him in the head. Andy returned and fought defendant for awhile, and then David jumped on him.

After defendant pulled out the knife, everyone but Andy and Steve ran for safety, locking themselves in the bathroom. As Kelly ran into the bathroom, some unidentified person grabbed her hair. While Kelly, Virginia, Phil, Juan and Samantha were locked in the bathroom, Virginia attempted to call the police, but the telephone did not work.

Someone in defendant's group said the police were coming, and they all fled. The police arrived and recovered the knife defendant had dropped when

he and David were physically attacking Andy. Andy suffered a swollen and black eye as a result of the attack. Steve received a cut on his lip.

*Defense*

David Butler was the sole witness called by the defense. He testified that the argument in the laundry room was with him, not defendant. Kelly threatened to have her husband take care of the matter. David responded by telling her that if Andy came to his house, he would hit him in the head with a bat.

David saw Andy arrive home from work, and shortly after, David went to Andy's apartment. He told Andy to tell Kelly to stop causing problems and "disrespecting" people. When Andy refused to do as David suggested, David left and stood in front of the Butlers' apartment. The police came and spoke with David and the Mendozas, but left without making any arrests. After the police left, Andy went outside and said the police were going to get David, and the Mendozas were going to continue to disrespect the Butlers. David ran toward Andy, causing Andy to retreat inside his apartment to call the police. The police arrived and spoke with both parties before leaving.

Subsequently, David, defendant and two friends were hanging out when the Mendozas arrived at the Seaberrys' apartment followed by three men who arrived in a car. Virginia came outside and told the men that David had disrespected her. David admitted having cursed at Virginia, but denied grabbing her arm. Phil Henderson, who was one of the three men, approached David, followed by Juan and Andy. Henderson said, "What's up?" and put his hands up. David took this as a challenge to fight, so he pushed Henderson as Henderson started to back away. Virginia was instigating the fight. David threw the first punch and backed Henderson up to the doorway of the Seaberrys' apartment. David saw Andy in the doorway, went after him, and hit him. Andy retreated into the apartment and David followed him, eventually knocking Andy down into a couch. Someone jumped on David's back, and defendant began hitting this other guy. Then everyone started fighting.

David eventually left the apartment with one of his friends, but returned when he realized defendant was still inside. When David returned, he saw Andy knock defendant down with a punch. David ran in and punched Andy.

Although David recognized the knife recovered by the police as belonging to defendant, David never saw defendant with the knife during the fight. David acknowledged that he wanted to protect his brother and did not want

to see him get into trouble. He also acknowledged that as a result of his involvement, he had pled guilty to first degree burglary and assault with intent to commit great bodily harm.

## Discussion

### I. The terrorist threat charge

Count IV of the information alleged a violation of section 422, and was based on the threat defendant made to Virginia Seaberry. Defendant contends the evidence is insufficient to sustain his conviction in count IV for making a terrorist threat because no evidence proved (1) the specific, identified crime threatened, or (2) that the crime threatened would result in death or great bodily injury. Continuing the same theme, defendant also argues the court committed prejudicial error by failing to (1) identify the crime threatened, and (2) failing to instruct, sua sponte, on the elements of that identified crime. We reject these contentions.

### A. Sufficiency of the evidence

█ " 'When the sufficiency of the evidence is challenged on appeal, the court must review the whole record in the light most favorable to the judgment to determine whether it contains substantial evidence—i.e., evidence that is credible and of solid value—from which a rational trier of fact could have found the defendant guilty beyond a reasonable doubt.' [Citations.]" (*People v. Jennings* (1991) 53 Cal.3d 334, 364 [279 Cal.Rptr. 780, 807 P.2d 1009].)

█ There is no merit to defendant's contention that his threat was too ambiguous to constitute a threat within the meaning of section 422.[2] A threat is sufficiently specific where it threatens death or great bodily injury. A threat is not insufficient simply because it does "not communicate a time or precise manner of execution, section 422 does not require those details to be expressed." (*In re David L.* (1991) 234 Cal.App.3d 1655, 1660 [286 Cal.Rptr. 398].)

---

[2]Former section 422 provided in pertinent part: "Any person who willfully threatens to commit a crime which will result in death or great bodily injury to another person, with the specific intent that the statement is to be taken as a threat, even if there is no intent of actually carrying it out, which, on its face and under the circumstances in which it is made, is so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat, and thereby causes that person reasonably to be in sustained fear for his or her own safety or for his or her immediate family's safety, shall be punished by imprisonment in the county jail not to exceed one year, or by imprisonment in the state prison."

Section 422 is part of the California Street Terrorism Enforcement and Prevention Act passed by the Legislature in 1988. (Stats. 1988, ch. 1256, § 4, pp. 4184-4185.)

 "In order to find appellant guilty of making a terrorist threat in violation of section 422, evidence to prove the following elements was required: 1) appellant willfully threatened to commit a crime which if committed would result in death or great bodily injury; 2) he made the threat with the specific intent that the statement be taken as a threat; 3) the threatening statement, on its face and under the circumstances in which it was made, was so unequivocal, unconditional, immediate and specific as to convey to the person threatened a gravity of purpose and an immediate prospect of execution of the threat; and 4) the threatening statement caused the other person reasonably to be in sustained fear for his [or her] own safety [or for his or her immediate family's safety], regardless of whether appellant actually intended to carry out the threat. (See CALJIC No. 9.94.)" (*People v. Melhado* (1998) 60 Cal.App.4th 1529, 1536 [70 Cal.Rptr.2d 878].)

 Virginia testified defendant called her "a fucking bitch," and told her she needed to mind her own business or she "was going to get hurt." Defendant questions what crime it is to "hurt" a person, and whether that crime would result in death or great bodily injury. However, we answered these questions in *People v. Martinez* (1997) 53 Cal.App.4th 1212, 1218 [62 Cal.Rptr.2d 303]:

"Defendant argues his threat to Iorio was vague and did not specifically convey a threat of great bodily injury or death; he claims it was little more than 'mouthing off' and posturing.

"We agree that the words, 'I'm going to get you,' 'I'll get back to you,' 'I'll get you,' may not, standing alone, convey a threat to commit a crime which will result in death or great bodily injury. But, as shall be discussed, we find that the meaning of the threat by defendant must be gleaned from the words and all of the surrounding circumstances.

"Appellate courts have disagreed whether a threat is to be judged solely on the words spoken or if the words should be interpreted based on all the surrounding circumstances. Although we acknowledge these cases involve a different aspect of section 422 than the aspect we are determining here, the discussions regarding the interpretation of a threat based on only the facial content of the language used, versus an interpretation based on all the surrounding circumstances, are pertinent to our decision."

Thus, it is the circumstances under which the threat is made that give meaning to the actual words used. Even an ambiguous statement may be a basis for a violation of section 422. (*People v. Jones* (1998) 67 Cal.App.4th

724, 727-728 [79 Cal.Rptr.2d 258], citing *People v. Bolin* (1998) 18 Cal.4th 297 [75 Cal.Rptr.2d 412, 956 P.2d 374].)

 "[T]he determination whether a defendant intended his words to be taken as a threat, and whether the words were sufficiently unequivocal, unconditional, immediate and specific they conveyed to the victim an immediacy of purpose and immediate prospect of execution of the threat can be based on all the surrounding circumstances and not just on the words alone. The parties' history can also be considered as one of the relevant circumstances. (See, e.g., *People* v. *Martinez*[, *supra*,] 53 Cal.App.4th 1212, 1218 . . . [the meaning of the defendant's threat must be gleaned from the words and all of the surrounding circumstances]; . . . *People* v. *Stanfield* [(1995)] 32 Cal.App.4th 1152, 1159 [38 Cal.Rptr.2d 328] [the statute does not concentrate on the precise words of the threat but whether the threat communicated a gravity of purpose and immediate prospect of execution of the threat].)" (*People v. Mendoza* (1997) 59 Cal.App.4th 1333, 1340-1341 [69 Cal.Rptr.2d 728].)

In *Mendoza*, the appellant stated: " 'you fucked up my brother's testimony. I'm going to talk to some guys from Happy Town'. . . ." (*People v. Mendoza, supra,* 59 Cal.App.4th at p. 1340.) The court agreed with the appellant that this "did not articulate a threat to commit a specific crime resulting in death or great bodily injury." (*Ibid.*) However, in looking at the circumstances under which the threat was made, the court concluded, as we did in *Martinez,* that it was sufficient for a violation of section 422. "Thus, although appellant's words were ambiguous, did not mention a particular criminal act or give other particulars, a rational juror could have found—based on all the surrounding circumstances—appellant's words were sufficiently unequivocal, unconditional, immediate and specific to convey to Arambula a gravity of purpose and immediate prospect of death or serious bodily injury." (59 Cal.App.4th at p. 1342.)

 The circumstances here also establish that defendant's threat to hurt Virginia was a violation of section 422. Virginia was aware the Mendozas were in fear because defendant and his friends had been terrorizing them. Defendant and four or five other teenagers surrounded Virginia at her apartment complex. Defendant not only confronted her, he impressed upon Virginia just how serious he was by grabbing her arm, i.e., committing a battery upon her when he made his threat. In doing so, he emphasized his willingness and intent to hurt her if she did not mind her own business. (See *People v. McCray* (1997) 58 Cal.App.4th 159, 172 [67 Cal.Rptr.2d 872] [past physical abuse is probative on whether the victim was reasonably in fear for her safety by the defendant's threats]; *People v. Garret* (1994) 30

Cal.App.4th 962, 967 [36 Cal.Rptr.2d 33] [same].) Defendant further impressed upon Virginia the gravity of the situation by bragging that his gang, "El Norte," owned the apartments. Defendant also demeaned Virginia by gratuitously calling her "a fucking bitch." Virginia felt very intimidated because the group surrounded her while she was alone, and she perceived defendant's statement to be a threat.[3] While there was no evidence presented at trial, other than defendant's own statements, that defendant was a member of the Norteños gang, there was no basis for Virginia to doubt this alleged association.

Standing alone, these circumstances are sufficient evidence for a violation of section 422; however, there is more. Immediately after making his threat, defendant and his so-called El Norte gang followed Virginia to her apartment and tried to stop her from entering the apartment. Defendant threatened to get a gun and kill everyone inside. He then forcibly invaded her home and knocked down her young daughter, and committed an assault with a deadly weapon upon Andy by using a knife. When Virginia left the safety of her locked bathroom, she could see defendant and his friends had physically assaulted Andy and Steven Seaberry. This conduct further showed that defendant specifically intended his statement to be interpreted as a threat. Additionally, the threatening statement was so unequivocal, unconditional, immediate and specific as to convey a gravity of purpose and an immediate prospect of execution of the threat. (*People v. Bolin, supra,* 18 Cal.4th at pp. 337-340.) All these factors taken in conjunction with defendant's threats and assaultive conduct, led Virginia to reasonably be in sustained fear for her safety.

### B. No requirement to identify a specific crime or instruct on its elements

Defendant argues the court committed prejudicial error by failing to (1) identify the crime threatened, and (2) instruct, sua sponte, on the elements of that identified crime. As can be seen from our earlier discussion, however, to constitute a section 422 violation, there is no requirement that a specific crime or Penal Code violation be threatened. It follows that no specific crime must be identified for the jury.[4] It further follows that the court is not required to instruct the jury on the elements of any specific

---

[3]In her statement to the probation officer, Virginia said she remains traumatized by defendant's invasion of her home and fearful of retaliation. It has been held that 15 minutes of fear may be sufficient to satisfy the "sustained fear" element of section 422. (*People v. Allen* (1995) 33 Cal.App.4th 1149, 1156 [40 Cal.Rptr.2d 7].)

[4]Identifying for the jury a specific crime threatened should not be confused with any requirement that the prosecutor make an election of the events relied upon when the evidence discloses a greater number of threats than those charged. Where no election is made, the jury

Penal Code violations that might be subsumed within the actual words used to communicate the threat.

The only support cited by defendant for his position is the CALJIC Committee's Use Note to CALJIC No. 9.94. It states: "The court must instruct on the elements of the threatened crime." The use note cites no authority for imposing this requirement. In light of the manner in which the Courts of Appeal and the Supreme Court have interpreted section 422, we conclude there is no basis for imposing such a requirement as a general rule.

We begin with the history of section 422, which opens with the phrase, "Any person who willfully threatens to commit *a crime* . . . ." (Italics added.) The history is concerned with the statute's ability to pass constitutional muster, and was not intended to require that the person specifically threaten an enumerated offense prohibited by the Penal Code. (See *In re Ge M.* (1991) 226 Cal.App.3d 1519, 1524 [277 Cal.Rptr. 554] [former § 422 was declared unconstitutional and new version was intended to overcome unconstitutionality of the former section].)

"The genesis of the language in Penal Code section 422 is well known. In 1981, the California Supreme Court invalidated former section 422 as unconstitutionally vague. (*People* v. *Mirmirani* (1981) 30 Cal.3d 375, 388 [178 Cal.Rptr. 792, 636 P.2d 1130].) The statute was repealed in 1987, and a substantially revised statute was enacted in 1988. (Stats. 1987, ch. 828, § 28, p. 2587; Stats. 1988, ch. 1256, § 4, pp. 4184-4185.) The relevant statutory language was adopted almost verbatim from *United States* v. *Kelner* (2d Cir. 1976) 534 F.2d 1020 [34 A.L.R.Fed. 767], a case which discussed the boundaries imposed by the First Amendment on the punishment of threats. [Citation.] Because the language of the California statute was drafted to comport with *Kelner*, we can gain insight on the meaning of the statutory language from *Kelner*, its antecedents, and subsequent interpretations by other courts of the *Kelner* language incorporated into section 422 of the Penal Code." (*People* v. *Stanfield, supra,* 32 Cal.App.4th at p. 1159, fn. omitted.)

■ In *In re M.S.* (1995) 10 Cal.4th 698, 710-711[42 Cal.Rptr.2d 355, 896 P.2d 1365], the Supreme Court further explained the development of the law in discussing the constitutionality of sections 422.6 and 422.7, the "hate crime" statutes:

must be given a unanimity instruction, such as CALJIC No. 17.01. (See *People v. Melhado, supra,* 60 Cal.App.4th at p. 1539; *People v. Dias* (1997) 52 Cal.App.4th 46, 54 [60 Cal.Rptr.2d 443]; cf. *People v. Salvato* (1991) 234 Cal.App.3d 872, 875-876 [285 Cal.Rptr. 837] [the court's refusal to require an election by the prosecutor is not in all cases cured by the giving of a jury instruction which requires unanimous agreement on the particular act supporting the conviction].)

"[T]he state may penalize threats, even those consisting of pure speech, provided the relevant statute singles out for punishment threats falling outside the scope of First Amendment protection. [Citations.] In this context, the goal of the First Amendment is to protect expression that engages in some fashion in public dialogue, that is, ' "communication in which the participants seek to persuade, or are persuaded; communication which is about changing or maintaining beliefs, or taking or refusing to take action on the basis of one's beliefs . . . ." ' [Citations.] As speech strays further from the values of persuasion, dialogue and free exchange of ideas, and moves toward willful threats to perform illegal acts, the state has greater latitude to regulate expression. [Citation.] Nonetheless, statutes criminalizing threats must be narrowly directed against only those threats that truly pose a danger to society. [Citation.]

"A threat is an ' "expression of an intent to inflict evil, injury, or damage on another." ' [Citation.] When a reasonable person would foresee that the context and import of the words will cause the listener to believe he or she will be subjected to physical violence, the threat falls outside First Amendment protection. [Citations.]" (10 Cal.4th at pp. 710-711.)

As can be seen, to pass muster under the First Amendment, a threat may be punishable only if it expresses the intent to inflict evil, injury or damage on another person, or to perform illegal acts, i.e., only those threats that truly pose a danger to society may be punished. In enacting section 422, the phrase "willfully threatens to commit a crime" is necessary in order to criminalize the threats. With reference to the hate crime statutes, the court concluded they "require proof of a specific intent to interfere with a person's right protected under state or federal law. This requirement helps protect against unconstitutional application to protected speech. [Citations.]" (*In re M.S., supra,* 10 Cal.4th at p. 713, fn. omitted.) Similarly, with regard to section 422, it requires the threat to commit crimes or illegal acts in order to take it out of First Amendment protection. (See *People v. Dias, supra,* 52 Cal.App.4th at p. 51 ["the federal courts after *Kelner* have concluded that not all threats to perform illegal acts are protected by the First Amendment"].)

"Violence and threats of violence . . . fall outside the protection of the First Amendment because they coerce by unlawful *conduct*, rather than persuade by expression, and thus play no part in the 'marketplace of ideas.' As such, they are punishable because of the state's interest in protecting individuals from the fear of violence, the disruption fear engenders and the possibility the threatened violence will occur. [Citation.]" (*In re M.S., supra,* 10 Cal.4th at p. 714.)

As noted by the court in *People v. Brooks* (1994) 26 Cal.App.4th 142, 149 [31 Cal.Rptr.2d 283], this is precisely why section 422 was enacted: "Penal

Code section 422 was passed by the Legislature as part of the 'California Street Terrorism Enforcement and Prevention Act' of 1988. A portion of that act provides: 'The Legislature hereby finds and declares that it is the right of every person . . . to be *secure and protected from fear, intimidation*, and physical harm caused by the activities of violent groups and individuals. It is not the intent of this chapter to interfere with the exercise of the constitutionally protected rights of freedom of expression and association. [¶] The Legislature, however, . . . finds that the State of California is in a state of crisis which has been caused by violent street gangs whose 'members *threaten, terrorize*, and commit a multitude of crimes against the peaceful citizens of their neighborhoods. These activities . . . present a clear and present danger to public order and safety and are not constitutionally protected.' (Pen. Code, § 186.21, italics added.)" (26 Cal.App.4th at p. 149.)

■ In light of the clear legislative intent and history pertaining to the enactment of section 422, there is no basis for concluding that before a jury may determine whether that section has been violated, a specific crime must be identified. Likewise, there is no basis for instructing the jury on the elements of the threatened crime. The CALJIC Committee's suggestion that such an instruction must be given is unsupported by case law or legislative history.

Here, the court properly discharged its duty by instructing the jury pursuant to CALJIC No. 9.94, as follows:

"Defendant is accused in Count [IV] of having violated Section 422 of the Penal Code, a crime.

"Every person who willfully threatens to commit a crime which will result in death or great bodily injury to another person, with the specific intent that the statement is to be taken as a threat, even if there is no intent of actually carrying it out, which threat, on its face and under the circumstances in which it is made, is so unequivocal, unconditional, immediate and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat, and thereby causes that person reasonably to be in sustained fear for his or her own safety or for his or her immediate family's safety, is guilty of a violation of Penal Code section 422, a crime.

"Great bodily injury means significant or substantial bodily injury or damage; it does not refer to trivial, insignificant, or moderate injury or harm.

" 'Immediate family' means any spouse, whether by marriage or not, parent, child, or any other person who regularly resides in the household, or who, within the prior six months, regularly resided in the household.

"In order to prove this crime, each of the following elements must be proved:

"1. A person willfully threatened to commit a crime which if committed would result in death or great bodily injury to another person;

"2. The person who made the threat did so with the specific intent that the statement be taken as a threat;

"3. The threatening statement on its face, and under the circumstances in which it was made, was so unequivocal, unconditional, immediate and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat; and

"4. The threatening statement caused the other person reasonably to be in sustained fear for his or her own safety or for her immediate family's safety.

"It is immaterial whether the person who made the threat actually intended to carry it out."

The instruction sufficiently identifies the elements of the crime that the jury was required to find to convict under section 422. Further instruction on the elements of the threatened crime is unnecessary. Indeed, there are at least two reasons why imposing a requirement on the trial court to so instruct would be unwise.

First, as the facts in *Martinez* (" 'I'm going to get you' "), *Mendoza* ("I'm going to talk to some guys from Happy Town' . . .") and this case ("mind [your] own business or [you're] going to get hurt") show, punishable threats can be nonspecific and ambiguous so long as they reasonably may be construed, under the circumstances, as threatening death or great bodily injury. Identifying a specific Penal Code violation and instructing on its elements for such nonspecific and ambiguous threats would be, in practice, almost impossible. It would be unrealistic to saddle our overworked trial judges with such an onerous task—a requirement that almost ensures failure and built-in instructional error.

Second, an instruction on the elements of the threatened crime will almost always conflict with the instructions regarding the elements for a section 422 violation. Specific intent to carry out the threatened crime is not required. (*People v. Fisher* (1993) 12 Cal.App.4th 1556, 1558 [15 Cal.Rptr.2d 889].) Yet, the elements of the threatened crime will almost certainly have a mens rea element to it. For example, if an element of the threatened offense is the specific intent to kill, how does the jury reconcile this requirement with CALJIC No. 9.94's instruction advising it that "It is immaterial whether the

person who made the threat actually intended to carry it out"? Can a person simultaneously have a specific intent to kill and no actual intention of killing when that person unlawfully threatens to kill another? A jury presented with this type of question would likely become confused.

Similarly, every crime has an actus reus element. For example, to be guilty of an assault with a deadly weapon a person must "commit an assault upon the person of another with a deadly weapon or instrument . . . ." (§ 245, subd. (a).) Yet, there is no requirement under section 422 or CALJIC No. 9.94 that the person making the threat must make any attempt to actually carry out the threat, let alone complete the act. How does a jury reconcile such conflicting instructions without the danger of confusion?

In his reply brief, defendant analogizes the CALJIC Use Note with a similar one provided in CALJIC No. 8.21 on first degree felony murder. Defendant's analogy to felony murder, however, misses the mark. The felony-murder law requires the actual commission of an unlawful killing of a human being during the actual commission or attempted commission of a felony and the specific intent to commit the felony. In addition, it requires that the specific intent to commit the felony and the commission or attempted commission of the felony must be proved beyond a reasonable doubt. (See CALJIC No. 8.21.) Under these requirements, it is critical for the jury to be instructed on the elements that constitute the felony that the defendant is charged with committing or attempting to commit. In contrast, section 422 does not require the commission or attempted commission of the threatened crime.

Finally, because experience shows punishable threats may be made in a variety of ways, it is possible that an instruction on the elements of the threatened crime may be helpful to the jury. For example, a person might threaten, "if you testify tomorrow, I'm going to find you and 187 your sorry behind." In such a situation, the jury may need instruction on what a "187" refers to. We leave it to the parties, however, to request any supplemental instructions to CALJIC No. 9.94, and for the trial court to rule on whether supplemental instructions would be more helpful than confusing to the jury.

II.-IV.*

. . . . . . . . . . . . . . . . . . . . . .

---

*See footnote, ante, page 745.

*Disposition*

The judgment is modified by striking all sentence enhancements for the prior serious felony and prior prison term except the five-year enhancement imposed on count I pursuant to section 667, subdivision (a), and affirmed in all other respects. The court shall prepare an amended abstract of judgment to reflect the modification of sentence. The petition for writ of habeas corpus is denied.

Dibiaso, Acting P. J., and Vartabedian, J., concurred.

Appellant's petition for review by the Supreme Court was denied March 14, 2001. Mosk, J., was of the opinion that the petition should be granted.