Filed 1/21/16  P. v. Hernandez CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B257841 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. GA090950) |
| v. | |
| FRANK HERNANDEZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Jared D. Moses, Judge.  Affirmed.

Linda L. Gordon, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Michael R. Johnsen, Supervising Deputy Attorney General, and Alene M. Games, Deputy Attorney General, for Plaintiff and Respondent.

_____

Defendant Frank Hernandez appeals from a judgment sentencing him to 40 years to life entered following a jury trial in which he was convicted of making terroristic threats. (Pen. Code, § 422, subd. (a).)[1] Defendant argues there was insufficient evidence that his threat was real and genuine or that Zolie C. (victim)[2] was actually or reasonably in sustained fear for her safety. We disagree and affirm.

## BACKGROUND

Victim met defendant at Eagle Rock Baptist Church in June 2012. Victim testified that at this church, older church members supported younger student members through small financial gifts with some regularity. In July 2013, about a year after initially meeting and when defendant was around 65 and victim was 23, defendant offered to pay a $400 tuition bill for victim. Defendant said he wanted to help victim because she was a struggling student at the time and not particularly close with her father. According to victim, defendant did not expect to be repaid and, because she thought this gift was like other gifts from the congregation, she did not think accepting it created any expectations. Defendant, on the other hand, testified that victim told him that while she wanted to maintain their relationship as a friendship for the time being, "something more" might occur later. Defendant wanted "something more" to occur and believed victim was insinuating a sexual relationship was possible.

According to victim, once defendant paid her bill, he began to be "very aggressive" and "very pressing" in contacting her via text messages and phones calls after obtaining her number without her knowledge. Through these communications, defendant allegedly tried forcing victim to spend time with him as a form of repayment for the money he had gifted her and threatened, if she refused, to "taint" her name in the church by spreading rumors she was having premarital sex with him and using drugs.

---

[1] Undesignated statutory references are to the Penal Code.

[2] Victim was identified in the information as Zolie C. and also was sworn and testified using her abbreviated surname.

Victim, who testified church is her "life," said she did not want to have a bad reputation at church. She eventually became "afraid" of defendant's "very threatening" behavior, especially after he began making sexual advances toward her and uncomfortably seeking her out at church. In addition to protecting her reputation and being afraid, victim also testified she felt "sorry" for older defendant and had "Christian compassion" for him.

Due to this mix of feelings, victim said she agreed to meet with defendant between July and September 2013 for coffee and lunch several times to "placate" him; she also, however, accepted several additional gifts, such as gas, from him during this period. Victim further admitted to sending defendant a "selfie" during this time in which she was making a "duck face" where her lips were puckered. Victim concedes she never told anyone in a position of authority about her fear of defendant. Despite remaining in contact and accepting gifts, she testified she would not meet with defendant past the late afternoon, fearing it "would allude probably to other things," never drove with him, and tried to set "boundaries" in texting.

By September 2013, however, defendant was contacting victim several times a day and telling her he wanted to marry her, which victim said was unwelcomed. Defendant said when he asked victim about marriage, she said she would reassess the relationship when she had completed school. Although victim was unaware, defendant at the same time was trying to discover her home address. By this point, victim felt defendant was threatening her life. Despite her fears and that she had to attend an important orientation meeting in the morning, victim agreed to meet defendant at a Starbucks on September 12, 2013, to allow defendant to give her money to visit her family. On the morning of September 12, defendant went to a bank, withdrew $1,000 in cash, and then cut off a GPS anklet he was wearing as a condition of parole for an unrelated prior offense. Defendant's parole officer was alerted to defendant's tampering and contacted defendant, telling defendant to wait for him to bring a replacement device. Defendant claims he waited 20 minutes for the officer to come but left because he was worried he might not be able to see victim if he waited for the officer. Defendant claims

3

his anklet was with him while he drove to Starbucks, but he could not explain why it did not track him there other than saying it sometimes malfunctioned.

Defendant arrived at the busy Starbucks ahead of victim. Despite that two parking spaces were open directly in front of the Starbucks' entrance, defendant parked at least 100 feet away; according to him, he parked there because it was his custom to do so. Before arriving, victim had asked defendant to purchase some Starbucks items for her because she was in a rush to make it to her meeting on time. Before he had a chance to do so, defendant saw victim park in front of the store and approached her vehicle. Defendant and victim dispute what happened next.

Defendant claims after they saw each other, victim disrespectfully shouted at him across the parking lot, complaining he did not have her items ready. He said he approached her car and tried helping her out to accompany him inside by guiding her by her elbow. Defendant said victim pushed him away, declaring she did not want to go inside if defendant was not planning to give her money. According to defendant, victim was so upset at the prospect of not receiving her money, she began rambling, hyperventilating, and trembling, which caused her to lean toward the passenger side of the car. Defendant claims he put his hands on victim's shoulders to stabilize her.

Victim's account of their encounter differs. She said that as she was about to open her door to exit her vehicle, she looked up and saw defendant opening the door for her. Victim alleges defendant said he wanted to show her something, lifted up his shirt, and exposed a gun in his waistband. Terrified, she tried dialing 911 but, according to her, defendant threw her phone out of her reach. She said she began to scream, but defendant told her if she did not "shut up," he would kill her. Thinking she was about to die, she claims to have continued screaming anyway. Defendant jammed the gun into the left side of her ribs, she testified, sending her into a convulsive panic attack. She testified she was frenzied and her screaming escalated to her begging for her life. At this point, she claims, defendant pistol-whipped her, the force of which stunned her into silence, and pushed her body toward the passenger side of the car. She claims at some point defendant motioned with the gun and told her to move into the passenger seat.

4

Two eyewitnesses testified at trial about what they saw occurring between victim and defendant in the parking lot. Jennifer Clark testified that as she exited Starbucks, she saw defendant standing in the open door area of victim's car. Victim was "hysterical." Defendant was "pushing at" the scared-looking victim. Clark made eye contact with victim through victim's passenger window as she was entering her vehicle, which was next to victim's. Victim mouthed "'help me.'" With her adrenaline soaring, Clark recounted, she moved to the passenger-side rear of victim's car and said to defendant, "'I don't think she wants you near her right now.'" Clark claimed defendant sputtered, "'okay, okay,'" but did not move. Victim then allegedly alerted Clark, "'He has a gun.'" Clark testified this prompted her to instruct defendant, "'I think you should get away from her now,'" while making shooing gestures at him. Clark said that as defendant walked away, the other witness, Consuelo Tejada, approached her, saying, "'What's going on? I saw something was going on.'" Clark testified that as she then dialed 911, victim, who was "a wreck," crouched down on the pavement behind the open driver's-side door to hide from defendant. By this point, defendant had reached his car and was fleeing. After giving the 911 operator defendant's license plate number, car type, and direction, Clark handed her phone to victim to speak with the operator. Clark later identified defendant from a "six-pack" photo lineup shown to her by police. She testified on cross-examination that she did not hear victim screaming, see defendant strike victim, or see defendant with a gun.

Tejada testified she exited Starbucks and was walking to her car, which was parked behind victim's, when she noticed "there was a situation going on" in victim's car that was "unusual." Victim, according to this witness, was shaking, crying, and "definitely in distress." Tejada said she saw defendant "leaning over looking into" victim's car and "holding her back." According to her, defendant's "full upper part" was inside the car at points. It looked to her like defendant was trying to push victim out of her seat. Senses piqued, Tejada sat in her car watching what was unfolding to see what she "needed to do next." As she observed defendant from her car, he was "looking around" in a manner indicating to her he was worried someone might be watching. After

5

seeing Clark intervene, Tejada exited her vehicle and approached victim's vehicle, now satisfied that "there was an issue." Tejada testified that after defendant fled, victim was terrified, shaking, crying, and could hardly speak. Tejada would not identify defendant either from a "six-pack" photo lineup or in the courtroom because she was not willing to say with "100 percent" certainty she recognized defendant's face. She testified on cross-examination she did not hear victim screaming, see defendant strike victim, or see defendant with a gun.

Law enforcement subsequently tracked and arrested defendant. When the officers searched defendant's residence, they found a package for a toy revolver. During her testimony, victim described the gun she said defendant threatened her with as a gunmetal-grey revolver.

The Los Angeles County District Attorney charged defendant with criminal threats (§ 422, subd. (a)), attempted kidnapping to commit rape (§§ 209, subd. (b)(1), 664), and attempted carjacking (§§ 215, subd. (a), 664). Defendant pleaded not guilty and was tried by a jury. The jury returned a guilty verdict on the criminal threats but could not reach a unanimous verdict on the kidnapping and carjacking counts; the court declared a mistrial as to the kidnapping and carjacking and those counts were dismissed at sentencing. The court sentenced defendant, under the Three Strikes Reform Act of 2012, to 40 years to life, including three five-year enhancements. Defendant appealed.

## DISCUSSION

On appeal, defendant argues his conviction was not supported by substantial evidence. We disagree and affirm.

Under a substantial evidence test, we determine whether the prosecution presented evidence "reasonable, credible and of solid value" such that any rational jury could have found the defendant guilty of the elements of the charged crime beyond a reasonable doubt. (*People v. Perez* (1992) 2 Cal.4th 1117, 1124, 1126; *People v. Fierro* (2010) 180 Cal.App.4th 1342, 1347 (*Fierro*).) "'[U]nless'" a witness's "'testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction.'" (*Fierro*, at p. 1347.) In this inquiry, "'it is the exclusive province of the

6

. . . jury to determine the credibility of a witness and the truth or falsity of the facts,'" and it is not for us to substitute our judgment for that of the jury's. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206 (*Ochoa*).) Finally, we review the record in the light most favorable to the judgment and "'presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.'" (*People v. Johnson* (1980) 26 Cal.3d 557, 576.)

To demonstrate a criminal threat, "'[t]he prosecution must prove "(1) that the defendant 'willfully threaten[ed] to commit a crime which will result in death or great bodily injury to another person,' (2) that the defendant made the threat 'with the specific intent that the statement . . . is to be taken as a threat, even if there is no intent of actually carrying it out,' (3) that the threat—which may be 'made verbally,'—was 'on its face and under the circumstances in which it [was] made, . . . so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat,' (4) that the threat actually caused the person threatened 'to be in sustained fear for his or her own safety or for his or her immediate family's safety,' and (5) that the threatened person's fear was 'reasonabl[e]' under the circumstances." [Citations.]' [Citations.]" (*Fierro*, *supra*, 180 Cal.App.4th at pp. 1347–1348.) A court may consider the circumstances surrounding a threat because "'the statute does not concentrate on the precise words of the threat but whether the threat communicated a gravity of purpose and immediate prospect of execution of the threat.'" (*People v. Butler* (2000) 85 Cal.App.4th 745, 753 (*Butler*); *People v. Mendoza* (1997) 59 Cal.App.4th 1333, 1340–1341, quoting *People v. Stanfield* (1995) 32 Cal.App.4th 1152, 1159.)

A.    **The record contains substantial evidence defendant's threat was real and genuine**

Defendant claims we should disregard victim's testimony about defendant showing her a gun and striking her with it because there is an absence of corroborative surrounding circumstances to substantiate her testimony. (*In re Ryan D.* (2002) 100 Cal.App.4th 854, 860 ["absence of circumstances . . . expected to accompany a threat"

7

may "dispel" claims of a threat].) Excluding victim's testimony, defendant claims the remaining evidence pointing to a "real and genuine" threat is "negligible."

Defendant's arguments, as explained below, however, essentially ask us to reweigh victim's testimony. While we will not reweigh victim's testimony in order to disregard it, as defendant requests, we will determine whether victim's testimony was substantial evidence to support defendant's conviction; in this inquiry, we may also consider the circumstances surrounding defendant's threat which corroborate victim's testimony. (*Ochoa*, *supra*, 6 Cal.4th at p. 1206 [appellate courts do not reweigh evidence or make testimonial credibility determinations]; *Fierro*, *supra*, 180 Cal.App.4th at p. 1347 ["'testimony of a single witness is sufficient to support a conviction'" so long as it is not "'impossible or inherently improbable'"]; *Butler*, *supra*, 85 Cal.App.4th at p. 753 [court may consider circumstances surrounding a threat].)

Victim's testimony alone was substantial evidence defendant threatened her: Victim testified defendant unequivocally verbally threatened her life while brandishing a firearm and physically touching her. There is no evidence in the record, and no argument by defendant, that defendant's words were hyperbole, unintentional, or in jest. (*People v. Stanfield*, *supra*, 32 Cal.App.4th at pp. 1161–1162 [threats must be "'distinguished from idle, careless talk, exaggeration or something said in a joking manner,'" "'vehement or emotional expression[s],'" or "'hyperbole'"].) This testimony alone was substantial evidence defendant threatened victim. (*Fierro*, *supra*, 180 Cal.App.4th at p. 1347.)

As to the lack of supporting circumstances, defendant highlights that neither witness saw defendant with a weapon or strike victim and did not hear victim screaming. While this is true, defendant ignores the fact that both witnesses saw defendant touching victim in what appeared to be a nonconsensual way and victim acting upset such that it caused both to stop, observe, and ultimately come to victim's defense. Both felt it was necessary to call 911 on victim's behalf. More important, neither claims to have witnessed the inception or entire duration of defendant and victim's interaction. The fact that neither witness can say with certainty precisely every event that occurred between victim and defendant does not mean their testimonies contradict or do not support

8

victim's version of events. (See *People v. Mendez* (2010) 188 Cal.App.4th 47, 59 ["[w]eaknesses in the testimony of eyewitnesses are to be evaluated by the jury"].)

Defendant also claims victim did not mention defendant had pistol-whipped her during her conversation with the 911 operator or in a statement she wrote a few hours after the incident for the police. As a preliminary matter, victim explicitly said in her 911 call defendant "started hitting my face." Even if she had not said this or the statement could be considered somewhat vague regarding the specifics of the threat, there are two reasons why victim's statements do not show a lack of circumstances indicating a threat. First, victim testified at trial she had been pistol-whipped. The jury was free to accept this testimony as true and was not obligated to discredit it merely because the victim did not mention the pistol-whipping when recounting what happened the day of the incident. (*Fierro*, *supra*, 180 Cal.App.4th at p. 1347.)

Second, defendant points to no law saying the jury must have evidence defendant physically assaulted victim to substantiate a threat. In contrast, what courts have recognized is that "[f]ew objects are as inherently threatening as a firearm." (*People v. Culbert* (2013) 218 Cal.App.4th 184, 190 (*Culbert*).) The jury here had substantial evidence to believe defendant had a gun: A witness testified victim told her so during the incident; this witness repeated that information to the 911 operator; victim reported the same to the operator; victim testified at trial defendant had a revolver; and police found a toy revolver wrapper at defendant's residence. In addition, defendant texted victim the day of encounter, saying, "I had the gun because someone was trying to kill me," although he claims this was in reference to an earlier, unrelated conversation.

Other circumstances also indicated victim had been threatened: Two bystanders noticed something so "unusual" and troubling was occurring, it caused them to stop and come to victim's aid; one witness testified victim mouthed "help me" to her; victim testified, "I thought I would never see my mom again. And I thought that this is it for me, I'm never going to make it home"; one witness testified victim crouched behind her car door to hide after defendant fled the scene; and, even by defendant's own account, victim was crying, upset, and shaking.

9

Defendant also points to victim's supposed lack of physical injuries as evidence she was not threatened as she testified; again, physical contact is not required to prove a threat. (§ 422 [no requirement of physical injury to constitute threat].) Although defendant is correct that a different jury may have found the lack of any documented physical evidence on victim of being pistol-whipped in the face problematic, it was not unreasonable for the jury to determine defendant nonetheless threatened victim, given the testimony and facts described above. In addition to the above evidence, victim also testified defendant shoved a gun in her ribs, which left a red mark.

Defendant also argues the nature and circumstances of the meeting are suspect. For example, he notes that victim, despite saying she was terrified of defendant, had agreed to meet and accept money from him and had been doing so for the past few months; defendant also alleges he had never threatened victim before. This meeting was to occur, no less, in broad daylight in a crowded area. Defendant is correct that some may regard victim's acceptance of gifts from defendant as questionable. Defendant is also correct that their past interactions and manner of their communication are relevant. (*In re Ryan D.*, *supra*, 100 Cal.App.4th at p. 860.) What defendant fails to consider, however, is that victim testified defendant had been "aggressive," she was scared for her life because of him, and she had been meeting with him only to "placate" him. Additionally, the fact that defendant and victim agreed to and did meet in broad daylight in a crowded area does not necessarily speak to defendant's rationality in planning what would occur at the meeting nor to what he eventually did or said during the heat of the encounter. For example, possibly speaking to both his lack of rationality and his more nefarious plans, defendant chose to park more than 100 feet away from the Starbucks' entrance, despite open spots directly in front of the store.

Defendant also questions victim's failing to admit to police that she was meeting with defendant to receive money from him. This too, however, does not show an absence of circumstances constituting a threat. Her reason for meeting defendant does not necessarily bare on whether he threatened her, and she did at some point tell law enforcement she had been expecting to receive a "gift" from defendant.

10

As described above, victim's testimony, the witnesses' testimonies, and other evidence gave the jury substantial evidence to believe defendant's threat was "real and genuine."

**B.    The record contains substantial evidence victim was actually and reasonably in sustained fear for her safety**

Defendant further argues victim was not actually or reasonably in sustained fear for her life.  (See § 422; *Fierro*, *supra*, 180 Cal.App.4th at pp. 1347–1348 [threat must actually cause victim to fear and fear must be reasonable under the circumstances].)  As to whether victim's fear was actual, defendant argues her 911 call shows it was not.  After victim told the operator she knew defendant's name, the operator asked victim to "hold on," to which victim replied, "No but I'm like running late to my orientation."  Defendant said victim expressed "no concern" in this response that fleeing defendant "ostensibly could still carry out the purported threat"; he likewise claims her inability to give an immediate and precise description of his flight suggests she was unconcerned with him being at large.  Defendant further criticizes the remainder of the conversation, alleging she was "more concerned about what she should be telling the operator," "minimizing" her relationship with defendant and "masking the true reason" they were meeting.

We will not find victim was not actually in fear for her safety merely because her 911 call was disjointed and ineloquent.  Such a finding would inadequately acknowledge the great toll a viscerally stressful situation has on one's ability to recall, reason, and recite.  Moreover, victim, who by defendant's own admission *was* crying and shaking, testified her orientation meeting was for a key City of Hope internship she had worked hard for and was necessary for her successful application to graduate schools.  Although her flip retort to the 911 operator's request to "hold on" may be questionable to some, others could chalk it up to immature adolescence or simply her overriding focus on her important orientation meeting.  In any event, the witnesses' testimonies about victim being a "wreck" and "hysterical," combined with victim's statements to the 911 operator that defendant had a gun, had given her a panic attack, had hit her, and she did not want

11

to see defendant again are enough evidence for a reasonable jury to find victim was in actual fear for her life. As to whether her fear was reasonable, the jury also had substantial evidence to find it was: Being touched or gestured at in an unwelcomed manner by a firearm would reasonably cause one to fear. (*Culbert*, *supra*, 218 Cal.App.4th at p. 190 [firearms are "inherently threatening"].)

Defendant argues even if we find victim was actually and reasonably in fear, there was no evidence supporting her claim her fear was sustained. According to defendant, victim "resumed going about her business without skipping a beat" after his alleged threat. The law, however, considers fear as "'sustained'" so long as it is not "momentary, fleeting, or transitory." (*People v. Allen* (1995) 33 Cal.App.4th 1149, 1156.) Here, if the testimony is to be believed, victim knew defendant wanted to kill her, had a gun, and was on the run. Victim also testified that when she wrote a statement several hours after the incident, she was still scared. This was sufficient evidence for the jury to conclude her fear was sustained. (*Allen*, at pp. 1155–1156 [victim was in "sustained" fear where defendant had threatened victim in the past and victim knew for 15 minutes defendant was "armed, mobile, and at large"].)

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED.


LUI, J.


We concur:


CHANEY, Acting P. J.


JOHNSON, J.

12