Filed 8/28/13  P. v. Whitehurst CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B236876 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. MA052697) |
| v. | |
| JERRY L. WHITEHURST et al., | |
| Defendants and Appellants. | |

APPEAL from judgments of the Superior Court of Los Angeles County. Kathleen Blanchard, Judge.  Affirmed.

Tanya Dellaca, under appointment by the Court of Appeal, for Defendant and Appellant Jerry L. Whitehurst.

Siri Shetty, under appointment by the Court of Appeal, for Defendant and Appellant Camellia R. Whitehurst.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, James William Bilderback II and Steven E. Mercer, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Jerry Whitehurst appeals from the judgment entered after a jury convicted him of burglary for taking part in a break-in at the home of his mother's perceived romantic rival. He contends that the trial court erred: by not allowing his co-defendant sister to give exonerating testimony on his behalf in front of the separate jury deciding his case; by allowing gang-related evidence; and by not dismissing a "Three Strikes" prior conviction allegation. He also contends we should reverse due to prosecutorial misconduct and because there was insufficient evidence to support the conviction. His sister, Camellia Whitehurst, appeals from the judgment that followed her conviction in the same case, contending that the trial court committed certain sentencing errors. We reject these contentions and affirm both judgments.

## FACTS AND PROCEDURAL HISTORY

On the morning of April 18, 2011, Camellia Whitehurst and three other persons broke into the Lancaster home where Deborah Whiting lived, threatened to beat her, and then ransacked the place. The incident arose from tension between Camellia Whitehurst's mother – Cathy Whitehurst – and Whiting over Billy Ray Collins, who was Cathy Whitehurst's live-in boyfriend. Cathy Whitehurst said she lived with Collins and claimed that Collins also had a romantic relationship with Whiting. Whiting claimed that she met Collins a few years earlier when he lived in a senior citizens apartment building and that they were only friends. However, Whiting said that Collins was a drunk and a liar who used her to make his girlfriends jealous.

The break-in was triggered when Whiting phoned Collins and Cathy Whitehurst answered Collins's phone. Unpleasant words were exchanged and the phone call ended. A few minutes later Camellia Whitehurst (the daughter) called Whiting, demanded to know why she kept calling Collins and taunting her mother (Cathy), and threatened to go to Whiting's home and beat or "whip her ass." Whiting told her to "come on," and then phoned her niece, Kori Sledge, and asked her to come over as back-up in case Camellia Whitehurst made good on her threat.

2

According to Whiting, Camellia Whitehurst arrived at Whiting's home within a half hour of that phone call, accompanied by a man and two other women. Camellia Whitehurst admitted her intention was to fight or assault Whiting. The front door to the house was open, but a screen door was closed and locked. Whiting heard banging on the screen door and someone yelling, "Where the bitch at?" and "We're here to whip your ass. Come on out here, bitch." Whiting tried to close the wooden front door but the man started kicking it. Whiting shared the house with her brother-in-law, Vernon Sledge, and ran down the hall to Sledge's bedroom to call for help. Then, Whiting heard the front door open and ran into her own bedroom to call her niece again.[1]

Sledge came out of his bedroom and saw Camellia Whitehurst, LaShonda Talley, and a man he later identified as Camellia Whitehurst's brother, Jerry Whitehurst, in or near the living room.[2] Sledge yelled at the intruders to leave. Talley and Camellia started to back out, but Camellia then began to ransack the house. She turned over a kitchen table, pushed over a china cabinet and bookshelf, and knocked a flat-screen TV to the floor, then walked out of the house with her companions. Talley picked up a chair that was in the front yard, tossed it through a window, and said, "This is on Crips." According to Sledge, Jerry took no part in the destruction and remained silent throughout the incident until the end, when he said, "Don't mess with my mother." All three then drove off in Camellia's red Ford Mustang.

Camellia, Jerry, and Talley were charged with burglary, vandalism, and making criminal threats. Camellia gave a statement to sheriff's deputies that admitted her guilt, but claimed that Jerry had not been involved and only showed up afterward when she called and asked him to drive her home. Talley's case was severed from the Whitehursts' trial. Jerry and Camellia were tried jointly, but separate juries were seated to decide their

---

[1]    We will refer to Vernon Sledge by his last name and to Kori Sledge by her full name or as "niece".

[2]    From this point on we will refer to Jerry and Camellia Whitehurst by their first names.

individual cases. Camellia was convicted of all three counts. Jerry was convicted of burglary, but acquitted of the vandalism and criminal threats charges.

Jerry contends the trial court erred by not allowing Camellia to testify in front of only his jury that he played no part in the incident. He also contends that the trial court erred by allowing evidence of Talley's statement that the incident was "on Crips;" the trial court should have struck a Three Strikes allegation; the prosecutor committed misconduct during jury arguments; and there was insufficient evidence to support the burglary conviction.

Camellia contends that the trial court erred by imposing a mid-term sentence of four years for the burglary conviction, and by imposing consecutive sentences of eight months each for the two other counts.

## DISCUSSION

1. *No Error Occurred In Connection With Camellia's Failure to Testify*

   A. <u>Background Facts</u>

The sheriff's officer who took Camellia's statement where she implicated herself and tried to exonerate Jerry testified about that statement in front of her jury only. Shortly afterward, counsel for Jerry said he wanted to call Camellia as a witness, and that he had discussed the matter with Camellia's lawyer, who said she did not intend to testify. The trial court asked Camellia's lawyer if he had discussed with her the prospect of testifying on her own behalf or Jerry's. The following colloquy occurred:

"[Camellia's counsel]: She inquired of me whether if she chose to testify she would be testifying in front of both juries. And based upon my understanding of the law she would.

"[The Court]: Yes. And her statement would be admissible, obviously, against her.

"[Camellia's counsel]: Against her as well.

"[The Court]: Yes.

4

"[Camellia's counsel]:  Yes.

"[The Court]:  Based on that is she invoking her Fifth Amendment right [to remain silent]?

"[Camellia's counsel]:  Yes, ma'am.

"[The Court]:  Obviously, she has a valid Fifth Amendment right.  Her case is still outstanding.  And so I will recognize that.  And not only will she not be allowed to be called, but none of this will be discussed in front of *[sic]* jury.  Meaning, she doesn't have to invoke her Fifth in front of either jury."  There was no other discussion concerning whether Camellia could or would testify.

B.      Jerry's Contentions

Jerry characterizes the trial court's colloquy with Camellia's lawyer as a ruling that barred him from calling her as an exonerating witness and contends the trial court erred by not allowing Camellia to testify in front of his jury only, and not hers.  We reject this contention for several reasons.

First, Jerry's contention is based on the premise that his sister would have testified in front of his jury only if that testimony did not effect a waiver of her Fifth Amendment rights when it came to the jury deciding her case.  In other words, he assumes that the trial court could have allowed Camellia to testify at "his" trial but preclude use of that testimony at "her" trial.  Therefore the true issue we are asked to resolve is whether Camellia could have testified for Jerry in front of his jury without waiving her Fifth Amendment rights and thereby preclude use of her testimony against her in front of her jury.  However, Jerry never challenged the statement by Camellia's lawyer that she would have to testify before both juries, and never objected to the trial court's acquiescence in that assertion.  Instead, he remained silent.  As a result, his objections are waived.  (*People v. Mitcham* (1992) 1 Cal.4th 1027, 1048 [waiver for failure to join in severance motion].)

Second, Jerry never addresses what we have identified as the real issue on appeal.  Instead, he analyzes his contention through the prism of decisions that create an

5

exception to the preference for joint trials of defendants charged with the same offense when there is a likelihood that one defendant will waive his Fifth Amendment rights in order to offer exonerating testimony for a co-defendant. (Pen. Code, § 1098; *People v. Conerly* (2009) 176 Cal.App.4th 240, 249; *United States v. Gay* (9th Cir. 1978) 567 F.2d 916, 929.) We therefore deem the issue waived for that reason. (*People v. Beltran* (2000) 82 Cal.App.4th 693, 697, fn. 5.)

Third, we reject the contention on the merits.[3] The general rule is that a defendant's testimony at a previous trial is admissible against him in a later proceeding. (*United States v. Baker* (9th Cir. 1988) 850 F.2d 1365, 1370, citing *Harrison v. United States* (1968) 392 U.S. 219, 222.) Co-defendants who testify at severed trials may still be deemed to have waived their Fifth Amendment rights and have that testimony used against them at later trials. (*United States v. Gay, supra,* 567 F.2d at p. 920 [in affirming order denying severance of trials noted that if one co-defendant waived the privilege at trial of other co-defendants, his testimony could have been used against him at his own subsequent trial]; *United States v. Jackson* (8th Cir. 1977) 549 F.2d 517, 525 [grant of separate trials would not necessarily have allowed co-defendants to give exonerating testimony on behalf of other co-defendant without waiving Fifth Amendment rights].) In short, the trial court and Camellia's lawyer both correctly recognized that Camellia's testimony for Jerry could have been used against her at her ongoing trial. It was that realization, not anything the trial court did or did not do, that resulted in Camellia not testifying.

---

[3] We do so in order to forestall a habeas corpus petition because Jerry contends that his trial lawyer's failure to object amounted to ineffective assistance of counsel. (*People v. Thurman* (2007) 157 Cal.App.4th 36, 43, fn. 5.) Because we conclude that any such objection lacked merit and therefore would have been futile, the failure to object was not ineffective assistance of counsel. (*People v. Beasley* (2003) 105 Cal.App.4th 1078, 1092.)

2. *The Trial Court Did Not Err By Allowing Evidence That Talley Referred to the Crips Gang*

Jerry objected to allowing Sledge to testify about Talley's parting comment that "this was on [the] Crips," contending that gang evidence was not relevant to the case because there were no gang allegations, making the evidence unduly prejudicial under Evidence Code section 352. The trial court allowed the evidence because it was highly relevant to the criminal threats count, which required proof that the victims had reasonably been put in sustained fear. (Pen. Code, § 422.) It also gave the jury a limiting instruction that the evidence was applicable only as to the effect it might have had on the victims. The jury was also told that the evidence could not be considered as proof that defendants were members of the Crips or otherwise of bad character, and that it could not speculate on that issue. Jerry contends the trial court erred. We disagree.

The courts in *People v. Butler* (2000) 85 Cal.App.4th 745, 754-755, and *People v. Mendoza* (1997) 59 Cal.App.4th 1333, 1342, held there was sufficient evidence that victims were reasonably placed in sustained fear in cases where defendants' threats included references to a gang. Although the admissibility of those gang references was not at issue in those decisions, they indicate that such evidence is relevant to the sustained fear element of a criminal threats charge.

Jerry contends that even if the evidence was relevant, it had little probative value and, given the inflammatory nature of gang evidence, was highly prejudicial under Evidence Code section 352. However, we believe the evidence was more than minimally relevant. When combined with the trial court's limiting instruction, we conclude that the trial court did not err in allowing the evidence. (*People v. McKinnon* (2011) 52 Cal.4th 610, 670-671.)

Jerry contends the limiting instruction was insufficient to overcome the prejudice caused by the evidence and that we need not presume the jury obeyed the trial court's limiting instruction. First, he does not contend that he ever objected to the trial court's instruction, and the issue is therefore waived. (*People v. McKinnon, supra,* 52 Cal.4th at p. 670.) Second, the decisions he cites for the proposition that we may not presume the

7

jury followed the limiting instruction require an overwhelming probability that the jury would be unable to do so and a strong likelihood that the evidence would be devastating to the defendant. (See *Greer v. Miller* (1987) 483 U.S. 756, 767, fn. 8.) Nothing in the record suggests that either requirement has been satisfied. As a result, we apply the presumption that the jury in fact abided by the instruction. (*McKinnon* at p. 670.)

3.      *No Prosecutorial Misconduct Occurred*

Jerry contends the prosecutor committed five instances of misconduct while arguing the case to the jury.[4] These were:

(1) stating that Vernon Sledge and Kori Sledge were truthful because they were never examined about certain events, adding that Vernon Sledge's testimony was irrefutable. Jerry contends this was misconduct because both Sledges were examined at trial and thereby misstated the evidence, and because it told the jury not to evaluate the credibility of those witnesses.

Even if the misstatements concerning whether the Sledges had testified were misconduct, an issue we do not decide, we will reverse only if a more favorable result was reasonably probable absent the misconduct. (*People v. Navarette* (2003) 30 Cal.4th 458, 512.) The jury certainly knew that defense counsel had examined those witnesses and we therefore deem it highly unlikely that the jury gave that incorrect assertion any weight. As to whether this comment told the jury not to bother evaluating the credibility of those witnesses, we note that Jerry's lawyer apparently agreed with the prosecutor's assessment of the Sledges's credibility because he told the jury that the Sledges were good and straightforward witnesses. As a result, it is unlikely that the prosecutor's misstatement played any improper role in the jury's evaluation of their credibility.

---

**4**      Jerry's trial counsel objected to only the second comment. As a result, his other claims of misconduct are waived. (*People v. Bonilla* (2007) 41 Cal.4th 313, 336.) Because Jerry contends that he received ineffective assistance of counsel due to the lack of objections to four of the five disputed remarks, we alternatively consider the statements on the merits in order to forestall a habeas corpus petition. (*People v. Thurman, supra,* 157 Cal.App.4th at p. 43, fn. 5.)

(2)  Incorrectly attributing to Jerry the statement, "Where's the bitch at?  I'm gonna whup your ass."

Jerry objected to this statement and the trial court sustained the objection and told the jury that the prosecutor had misstated the testimony.  The prosecutor then corrected himself and clarified that Jerry had been present when others made those statements.  Jerry does not address why the trial court's admonition failed to cure the prosecutor's misstatement.  When that admonition is combined with the prosecutor's clarification, we conclude that the misstatement had no effect on the jury.

(3)  Stating that Jerry aided and abetted the crimes because "of course he's encouraging.  He's in the car, encouraging, facilitating, instigating this whole thing, instigating it with each other," and that "he came, he traveled with them, he encouraged this."

Jerry contends this was misconduct because there was no testimony about what happened in the car or whether he had even been in the car at all.  Prosecutors have broad discretion to state their views concerning reasonable inferences to be drawn from the evidence.  (*People v. Cunningham* (2001) 25 Cal.4th 926, 1026.)  Whiting testified that a man kicked in her door.  Sledge testified that Jerry was the man he saw in his house accompanying Camellia and Talley.  Both Sledges testified that Jerry and the others left together in Camellia's Mustang.  It is reasonable to infer from this that Jerry came with the others and kicked in the door to the Whiting-Sledge house, and that he was at least encouraging or facilitating the break-in.  Accordingly, we see no misconduct.

(4)  Asking the jury whether there comes "a time in our society where we just say enough is enough?  No more blame shifting, no more trying to escape responsibility for what you did.  Enough is enough.  You did the crime, you did the act, let's hold you responsible for that.  [¶]  Just imagine, Camellia Whitehurst, well, she didn't kick the door in so she didn't *[sic]* the burglary that they were going to kick the door.  She was just outside.  She just wanted to be outside the fight.  And then Jerry kicks the door in.  And he goes inside and she just follows.  Maybe she knocked over some stuff, but she wasn't there to commit a burglary.  She wasn't there to do that.  It was all Jerry.  It was

9

all blame it on him. He was the one who kicked the door. That could be her argument. Just as easily. It's just shifting blame. That's all we're doing is saying, 'Let's just shift it to somebody else. Let's throw it on somebody else.' It's got to stop at some point."

(5) Telling the jury, "It is time to stop letting people shove responsibility on to someone else. Say, 'You be responsible.' . . . It's time to stop that. It's madness. It's time to start holding people responsible for their acts." This was followed by the statement, "We're just asking you to hold him responsible and to find him accountable for that."

As to numbers (4) and (5), Jerry contends the prosecutor made an impermissible appeal to the passion and prejudice of the jury. We do not see it that way. Jerry cites decisions where the prosecutor asked the jury to put themselves in the victim's place (*People v. Fields* (1983) 35 Cal.3d 329, 362), or to imagine the defendant had kidnapped and raped their children (*People v. Pensinger* (1991) 52 Cal.3d 1210, 1250). The prosecutor has wide latitude to vigorously argue his case and make comments fairly on the evidence and the reasonable inferences to be drawn from it. (*People v. Dykes* (2009) 46 Cal.4th 731, 768.) We read the disputed comments as nothing more than vigorous argument designed to undercut the contention that Jerry had no involvement in the break-in or other crimes because he merely stood by while it happened. As a result, we hold that these statements were not misconduct.

4.    *The Trial Court Did Not Abuse Its Discretion By Not Dismissing A Three Strikes Allegations Against Jerry*

The information alleged that Jerry had a 2003 felony conviction for making terrorist threats (Pen. Code, § 422) that counted as a strike under the Three Strikes law (Pen. Code, §§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d)). The same conviction was alleged for purposes of the five-year sentence enhancement provided by Penal Code section 667, subdivision (a)(1). The 2003 terrorist threat conviction was alleged along with a 2007 felony conviction for driving with wanton disregard for the safety of others

10

while evading a pursuing police officer (Veh. Code, § 2800.2) for purposes of the one-year sentence enhancement provided by Penal Code section 667.5, subdivision (b).

Jerry admitted the truth of both prior convictions, but brought a motion to dismiss the Three Strikes allegation (Pen. Code, § 1385), which the trial court denied. The trial court imposed a combined nine-year state prison sentence as follows: the low term of two years for the burglary, which was doubled under Three Strikes, plus five years for the serious felony conviction under Penal Code section 667, subdivision (a)(1). Jerry contends the trial court erred by denying his motion to dismiss the Three Strikes allegation.

The Three Strikes law was designed to limit the trial court's discretion when sentencing repeat offenders (*People v. Carmony* (2004) 33 Cal.4th 367, 377), but Penal Code section 1385, subdivision (a) allows the court to dismiss a Three Strikes allegation in furtherance of justice (*People v. Superior Court (Romero)* (1996) 13 Cal.4th 497, 529-530). The trial court's ruling on such a motion is subject to a deferential abuse of discretion standard. The trial court abuses its discretion only if was not aware of its discretion to dismiss, or considered impermissible factors in doing so. The appellant bears the burden of showing the sentence was irrational or arbitrary, and we will not reverse simply because reasonable people might disagree about the trial court's sentencing choice. (*Carmony* at pp. 376, 378.) When considering a motion to dismiss a Three Strikes allegation, the trial court must consider whether the defendant is outside the scheme's spirit in whole or in part in light of the nature and circumstances of his present felonies and prior serious or violent felony convictions, along with the particulars of his background, character, and prospects. (*People v. Williams* (1998) 17 Cal.4th 148, 161.)

Jerry's probation report showed three sustained juvenile ward petitions for: robbery in 1998; misdemeanor marijuana possession in 1999; and a felony for dissuading a witness from testifying (Pen. Code, § 136.1) in 2001. His adult record consisted of the following: driving without a license (2002); a felony conviction for making terrorist threats in 2003; the 2007 felony for evading a pursuing police officer; and a 2010 misdemeanor for marijuana possession. The trial court reviewed this record, noting that

11

Jerry violated probation on the 2003 terrorist threats conviction. According to the trial court this record showed that Jerry had constantly violated the law, beginning with the robbery he committed at age 14. "So for a 27-year-old adult, Mr. Whitehurst has consistently basically been in the . . . criminal justice system both as a juvenile and as an adult in a revolving door-type of manner." Getting yet another felony conviction after being in and out of state prison "doesn't bode well for him" under the case authority applicable to motions to dismiss Three Strikes allegations, the court said.

Jerry contends the trial court abused its discretion because he took responsibility for his actions in this case, received an early discharge from parole in one of his prior convictions, had enrolled in the fire academy at a local college, and was otherwise trying to change the course of his life. We disagree. His criminal history is sufficiently lengthy and shows an inability to curb his penchant for criminal activity that prevents us from concluding that the trial court abused its discretion by finding that he did not fall outside the spirit of the Three Strikes law.

5. *There Was Sufficient Evidence That Jerry Committed A Burglary*

The crime of burglary is committed when someone unlawfully enters someone's premises with the intent to commit a theft or any other felony. (Pen. Code, § 459.) A defendant can also commit burglary by aiding and abetting, which requires proof that entry was made with the intent to encourage, facilitate, or assist someone else to carry out a burglary. (Pen. Code, § 31; *People v. Montoya* (1994) 7 Cal.4th 1027, 1038-1040.) Jerry contends there was insufficient evidence he harbored the requisite intent under either theory, in part because he was acquitted of the vandalism and terrorist threat counts, in part because the evidence showed he did nothing once inside the house, and in part because Whiting was an unreliable witness.

The rules regarding substantial evidence are well settled. We review the entire record in the light most favorable to the prosecution to determine whether it contains evidence that is reasonable, credible, and of solid value from which the trier of fact could find that the elements of the crime were established beyond a reasonable doubt. (*People*

12

*v. Tripp* (2007) 151 Cal.App.4th 951, 955.) We must draw all reasonable inferences in favor of the judgment. We do not reweigh the evidence, reappraise the credibility of witnesses, or resolve factual conflicts: those tasks belong to the trier of fact. We may reverse only if, upon no hypothesis whatsoever, is there sufficient substantial evidence to support the verdict. (*Ibid.*)

The evidence showed that Camellia went to Whiting's house intending to make good on her threat to assault Whiting, and that she was accompanied by a man and another woman. Whiting testified that a man kicked open the door to her house. Sledge identified Jerry as the man inside his house. Even though Jerry did and said nothing while Camellia vandalized the house, when her rampage was over he told Sledge, "Don't mess with my mother." He then drove off with Camellia and Talley. This evidence is more than enough to allow the inference that Jerry assisted his sister and entered the house with Camellia's original intent in mind – to commit a felonious assault – even if no assault ever took place.

6.      *Camellia's Sentence Was Not An Abuse of Discretion*

As to Camellia, the trial court imposed a combined state prison sentence of five years and four months as follows: a mid-term four-year sentence for the burglary, plus one-third the mid-term (eight months) each for the vandalism and terrorist threats counts. Camellia contends that the trial court abused its discretion by imposing a mid-term sentence for the burglary count and by running all three sentences consecutively.

We review the trial court's sentencing choices under the abuse of discretion standard. (*People v. Black* (2007) 41 Cal.4th 799, 821-822 [consecutive sentences]; *People v. Sandoval* (2007) 41 Cal.4th 825, 847 [selecting mid-term sentence].) When deciding whether to run sentences consecutively, the trial court is directed to follow certain criteria. Rule 4.425 of the California Rules of Court provides that these include: "(a) Facts relating to the crimes, including whether or not; [¶] (1) The crimes and their objectives were predominantly independent of each other; [¶] (2) The crimes involved separate acts of violence or threats of violence; or [¶] (3) The crimes were committed at

13

different times or separate places, rather than being committed so closely in time and place as to indicate a single period of aberrant behavior." The court may consider "[a]ny circumstances in aggravation or mitigation . . . except" for facts used to impose the upper term, a fact used to enhance a sentence, or a fact that is an element of the crime. (Cal. Rules of Court, rule 4.425(b).)

Camellia contends the trial court did not consider these circumstances. We disagree. The court said it had considered all the mitigating and aggravating factors. These included her lack of a criminal history and the fact that she acted out of a misguided instinct to protect her mother. However, the trial court said her actions were egregious because she "sought out this battle, went to this other woman's house . . . [and] induced others to commit the crime as well [and] acted as an initiator and a leader . . . ." This included inducing Jerry to take part in the crimes. The court also found that Camellia "engaged in violent conduct indicating a serious danger to society. The criminal threats especially involved great violence and the threat of great bodily harm. It just wasn't words but actions in carrying out that threat. In addition, the vandalism, that was a crime that involved damage of great monetary [and sentimental] value . . ."

By noting Camellia's lack of a criminal record, we believe the trial court considered the possibility that this was an isolated aberration. However, the court found that factor was outweighed by the serious nature of her crimes and the fact that she instigated and induced others to perform them. Camellia contends that the court's comments concerning the seriousness of her threats and the amount of damage done reflect only the elements of the crimes of vandalism and making terrorist threats. We disagree. Sustaining the vandalism count required proof that more than $400 damage had been caused, but the damages caused here apparently went well beyond that threshold. As for the criminal threats count, that act is completed by the comments themselves, but the trial court focused on the fact that Camellia broke into Whiting's house intending to carry out those threats. We believe that circumstance is something apart from the element of the crime and also justified a consecutive sentence.

14

Based on this, we also conclude that the trial court did not abuse its discretion by selecting the mid-term sentence for the burglary conviction.  (See Cal. Rules of Court, rule 4.420.)

## DISPOSITION

Both judgments are affirmed.


                                        RUBIN, ACTING P. J.

WE CONCUR:


        FLIER, J.


        GRIMES, J.