Filed 6/27/14  In re D.A. CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re D.A., a Person Coming Under the Juvenile Court Law. | B249519 (Los Angeles County Super. Ct. No. KJ 37380) |
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>D.A.,<br><br>        Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court for the County of Los Angeles. Geanene Yriarte, Juvenile Court Referee.  Affirmed.

Elana Goldstein, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Victoria B. Wilson and Carl N. Henry, Deputy Attorneys General, for Plaintiff and Respondent.

_____

## SUMMARY

In this delinquency case, the minor contends the evidence was insufficient to sustain true findings on three felony counts of attempted criminal threat. He also contends two conditions of probation were vague and overbroad and must be modified. We reject both contentions and affirm the judgment.

## FACTS

The District Attorney filed a petition on March 1, 2013, alleging that D.A., then 17 years old, came within the provisions of Welfare and Institutions Code section 602. The petition alleged three counts of felony criminal threat, one count on February 16, 2012, and two counts on February 24, 2012 (Pen. Code, § 422, subd. (a)), and two misdemeanor vandalism counts (Pen. Code, § 594, subd. (a)) based on the same conduct. The minor denied the allegations.

The incidents generating the petition occurred at Sierra Vista High School in Baldwin Park, where minor attended school. During the morning of February 16, 2012, security aide Gabriela Rodriguez discovered writing on the wall of a stall in the boys' restroom near room 310. The writing was in blue ink, and said: "Columbine was theirs. V Tech was his. SV will be mine." Restroom checks were done "very regularly," and Ms. Rodriguez had checked the restroom earlier in the morning and found the stall clear of graffiti. She reported this to Officer Miedema, a Baldwin Park Unified School District police officer. Ms. Rodriguez does not report every act of graffiti, but she reported this one because of "[t]he nature of the writing, the Columbine, V Tech because they were school shootings." "The fact that it said that and SV will be mine. I felt there was an imminent danger to the campus." Ms. Rodriguez was "anxious[] to report it and get it resolved."

A week or so later, on February 24, 2012, another security aide, Robert Romero, found graffiti in two boys' restrooms. In the restroom near room 310, writing in blue ink on one tile said, "Columbine, V Tech, and SVHS" and on another tile, "Blood will spill." In another restroom, near room 210, "Blood will be spilled" was written on the toilet paper dispenser. Mr. Romero photographed the graffiti and immediately notified his

2

supervisor.  He later testified that, "[w]henever I come across graffiti, I'll secure restroom doors, go straight to the office, grab our digital camera.  We photograph it immediately, get it documented, notify supervisor, immediate supervisor, let them know what we found.  And then . . . they'll notify the cleaning crew and clean it up as soon as possible."

While school police were informed of the writings,  the school apparently did not report these incidents to law enforcement beyond school police until February 28, 2012.  Mr. Romero spoke with Baldwin Park police on February 28.  Officer Miedema "inquired as to why the school had waited until February 28th to report the threats and was told because they had been busy."

The school sent a letter home to parents on February 29, 2012, indicating there were threats of violence toward the school.

Officer Jill Poe, a police captain with the Baldwin Park Unified School District, received a phone call on the evening of February 29, 2012, from a student.  The student said she had received some information that there was going to be a shooting at Sierra Vista High School the following day.  This telephone call caused Officer Poe to conduct further investigation.  Another student told her about a conversation the student had overheard, between two students, C.I. and another, "regarding information that they had of who actually wrote the graffiti on the walls, the bathroom walls of the school."

Officer Poe questioned C.I. on March 2, 2012, asking him if he had any information about the writings.  C.I. was hesitant, but he said that he knew of the writings on the bathroom walls and knew who had written them.  He told Officer Poe that the minor had written them.

According to Officer Poe, C.I. told her that he learned the minor had done the writings when the two met on the street on February 28, 2012, and "had a very brief conversation of what's up," and "what are you doing?"  The minor then told C.I., "I tried to stay out of trouble, but I fucked up.  I caused a big problem," and "I wrote on the walls."  C.I. told Officer Poe that he responded to the minor by saying, "I thought you were going to stay out of trouble.  You have to start thinking about what you're doing."  Then the two shook hands and went their separate ways.

3

Meanwhile, on March 1 and 2, there was "increased activity" at the school. "We brought in extra officers for the next probably several days, officers on overtime. We brought in City officers. We brought in our K9 dog to search the school prior to the students coming in to make sure there wasn't any kind of incendiary devices or anything that could have caused damage to the school."

On the days immediately after the school sent the letter to parents, about 500 students were absent from school, an "unusually high number of absences."

On March 2, the assistant principal, Alma Canal, interviewed the minor about the writings on the restroom walls. The minor told her that he did not do the writing, and did not know who had done it, but someone had told him about it. The minor told Ms. Canal that, "when he had been questioned by somebody else about who had done the writing, he responded oh, yeah, us, of course. You know us. We're thugs like that." The minor also told Ms. Canal he was joking when he made the statement just quoted. The minor talked about a comment he had posted on Facebook; he said the comment referred to a situation with his girlfriend and was not related to what was written in the restroom. The comment (as Ms. Canal reported it to Officer Poe), was "I fucked up. I caused a big problem. I shouldn't have said that."

At the adjudicatory hearing, the district attorney adduced the evidence just described. C.I. also testified. He admitted encountering the minor on February 28, 2012, and exchanging a hand gesture, but did not recall speaking to him except to say hello. C.I. said he had spoken to Officer Poe, but did not recall telling her that the minor said he had written on the restroom walls. C.I. did say that he told Officer Poe that he "wouldn't lie about this." When C.I. was then asked, "Did you actually say to Officer Poe, yes, I wouldn't lie about this to her about the statement [the minor] had made to you?" C.I. replied, "Yes." C.I. also admitted that Officer Poe asked him why he had not told anyone about the minor's statement about writing on the walls and causing a big problem, and he (C.I.) told Officer Poe that he did not want to get the minor into any more trouble.

The juvenile court denied the minor's dismissal motion, and the minor then testified in his own defense. He testified that he did not see the writings on the wall and

4

was not even aware of what had been written. He had encountered C.I., and they "said hi, but that was it." His Facebook comment referred to an incident with his girlfriend, and he ultimately deleted the posting because they resolved their problems. He cooperated with law enforcement, and was not expelled from the school; he was suspended for two days. He changed schools of his own accord, because everyone assumed he had done the writings even though he told them he had not. He had a 3.5 grade point average, or above, and wanted to get a job in law enforcement. Officer Poe asked the minor "basically how you knew about the writings on the bathroom wall when the information had not been released," and the minor told her he had heard a group of friends talking about it, but did not remember who told him.

The juvenile court found that the minor was responsible for the writings on the restroom walls, and that the first three elements of the crime of criminal threat were proven beyond a reasonable doubt. The court found the fourth element – that the threat actually caused the threatened person to be in sustained fear – was not proven. The court explained that there was no evidence of sustained fear by school officials, because "[t]hey acted one week after the last threat," and "[h]ad they taken the threat seriously, you would have seen more of an action by the school district on the actual date when the second threat was found"; the "letter sent on February 29th was far too late for such serious statements of violence . . . ." As for the student body, there was no evidence of sustained fear; the absences on March 1 and March 2 "were obviously directly related to the letter that was sent home on [February 29], the day before," and the court was "unclear as to what specifically was communicated to the students." The court found "based upon the record that the minor's threat was not conveyed in regard to the letter that was sent home by the school district . . . ."

The court concluded that "the fact that the third party thwarted the minor's offense does not free him from liability," and found each count to be felony attempted criminal threat. (The finding that school officials effectively thwarted the minor's offense was supported by Mr. Romero's testimony that graffiti is immediately photographed, reported and promptly removed, and by lack of any evidence "regarding what the students were

5

thinking or what they specifically heard," including the letter to parents in which "the minor's threat was not conveyed . . . .") The court also sustained the misdemeanor vandalism counts. The court declared the minor a ward of the court and placed him home on probation.

The minor filed a timely appeal.

## DISCUSSION

The minor argues there was insufficient evidence of attempted criminal threat, and that the court imposed probation conditions that were vague and overbroad. We find no merit in either contention.

### 1.     Sufficiency of the Evidence

When we review a claim of insufficient evidence, we determine whether, viewing the whole record in the light most favorable to the prosecution, the record discloses substantial evidence – evidence that is reasonable, credible, and of solid value – from which a reasonable trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (*People v. Osband* (1996) 13 Cal.4th 622, 690.)

In *People v. Toledo* (2001) 26 Cal.4th 221 (*Toledo*), the court "divide[d] the crime of criminal threat into five constituent elements . . . ." (*Id.* at p. 227.) The prosecution must establish "all of the following:  (1) that the defendant 'willfully threaten[ed] to commit a crime which will result in death or great bodily injury to another person,' (2) that the defendant made the threat 'with the specific intent that the statement . . . is to be taken as a threat, even if there is no intent of actually carrying it out,' (3) that the threat--which may be 'made verbally, in writing, or by means of an electronic communication device'--was 'on its face and under the circumstances in which it [was] made, . . . so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat,' (4) that the threat actually caused the person threatened 'to be in sustained fear for his or her own safety or for his or her immediate family's safety,' and (5) that the threatened person's fear was 'reasonabl[e]' under the circumstances." (*Id.* at pp. 227-228, quoting Pen. Code, § 422, subd. (a).)

6

*Toledo* explains the crime of attempted criminal threat. "[A] defendant properly may be found guilty of attempted criminal threat whenever, acting with the specific intent to commit the offense of criminal threat, the defendant performs an act that goes beyond mere preparation and indicates that he or she is putting a plan into action." (*Toledo, supra,* 26 Cal.4th at p. 230.) A defendant "acts with the specific intent to commit the offense of criminal threat only if he or she specifically intends to threaten to commit a crime resulting in death or great bodily injury with the further intent that the threat be taken as a threat, under circumstances sufficient to convey to the person threatened a gravity of purpose and an immediate prospect of execution so as to reasonably cause the person to be in sustained fear for his or her own safety or for his or her family's safety." (*Id.* at pp. 230-231.)

The *Toledo* court gave several illustrations of the crime of attempted criminal threat (*Toledo, supra,* 26 Cal.4th at p. 231), and stated: "[I]n most instances the crime of attempted criminal threat will involve circumstances in which the defendant in fact has engaged in *all* of the conduct that would support a conviction for criminal threat, but where the crime of criminal threat has not been completed only because of some fortuity outside the defendant's control or anticipation (for example, because the threat is intercepted or not understood, or because the victim for some reason does not actually suffer the sustained fear that he or she reasonably could have sustained under the circumstances)." (*Id.* at p. 234.)

This is precisely such a case. The trial court found there was no evidence adduced that the threats actually caused the victims – the students and school officials – to be in sustained fear for their safety. So far as the student victims are concerned, this was because the threats themselves were erased promptly and were not communicated by school officials to the student body. Thus, as to the student victims, this is a case where the threats were effectively "intercepted before delivery to the threatened person . . . ." (*Toledo, supra,* 26 Cal.4th at p. 231.) As for the school-official victims, the case is one where "for whatever reason, the threat [did] not *actually* cause the threatened person to be in sustained fear for his or her safety even though, under the circumstances, that

7

person reasonably could have been placed in such fear . . . ." (*Ibid.*) The fact that the victims "reasonably could have been placed in such fear" is demonstrated by the 500 absences that occurred after the school sent its letter to parents (which did not even describe the specific threat of a Columbine-like school shooting, but indicated only that there were threats of violence toward the school). It is also demonstrated by the reaction of the security aide who found the first threat on February 16: "I felt there was an imminent danger to the campus."

In short, "only a fortuity, not intended by [the minor] has prevented [the minor] from perpetrating the completed offense of criminal threat itself," and thus the minor "properly may be found to have committed the offense of attempted criminal threat." (*Toledo, supra,* 26 Cal.4th at p. 231.)

The minor contends that the words written on the walls did not convey an "immediate prospect of execution of the threat" as stated in the statute. He says the words themselves ("Columbine was theirs. V Tech was his. SV will be mine"; "Columbine, V Tech, SVHS, blood will spill"; and "blood will be spilled") "provide no specific time frame," and "were not written within any context that would suggest the timing." Therefore, the minor concludes, the prosecution did not prove he "intended to convey a threat that was sufficiently specific to convey an immediate prospect of execution," and so "he did not intend to commit the completed act of criminal threats."

We reject the minor's contention, which has no support in fact or law. The minor has plucked a few words from the statute and characterized them as an "element of attempted criminal threats that is missing" in this case. But that is not so, and the minor's reliance on *In re George T.* (2004) 33 Cal.4th 620 is misplaced.

*In re George T.* explains the pertinent point. "With respect to the requirement that a threat be 'so unequivocal, unconditional, immediate, and specific as to convey to the person threatened a gravity of purpose and an immediate prospect of execution of the threat,' we explained in *People v. Bolin* [(1998)] 18 Cal.4th 297, that the word 'so' in [Penal Code] section 422 meant that ' "unequivocality, unconditionality, immediacy and specificity are not absolutely mandated, but must be sufficiently present in the threat and

8

surrounding circumstances . . . .” ’ [Citation.] ‘The four qualities are simply the factors to be considered in determining whether a threat, considered together with its surrounding circumstances, conveys those impressions to the victim.’ [Citation.] A communication that is ambiguous on its face may nonetheless be found to be a criminal threat if the surrounding circumstances clarify the communication’s meaning.” (*In re George T., supra,* 33 Cal.4th at p. 635.)

Unlike *In re George T.*, this is not a case that “turn[s] on an examination of the surrounding circumstances given a communication’s vagueness . . . .” (*In re George T., supra,* 33 Cal.4th at p. 637.) Here, there was nothing vague or “ambiguous on its face” (*id.* at p. 635) about the language written on the restroom walls, and we have no need to look to “surrounding circumstances” to clarify its meaning. (*Ibid.*) The language of the threats alone – anonymous writings placed on school walls during school hours promising that “blood will be spilled” as at Columbine and V Tech – sufficiently conveys “a gravity of purpose and an immediate prospect of execution of the threat . . . .” (Pen. Code, § 422, subd. (a).) The threats were unequivocal, unconditional, and specific, and we know of no principle requiring a criminal threat to specify the precise time the threat is to be implemented. Indeed, the law is otherwise. (*People v. Butler* (2000) 85 Cal.App.4th 745, 752 [“A threat is not insufficient simply because it does ‘not communicate a time or precise manner of execution’ ”]; *In re David L.* (1991) 234 Cal.App.3d 1655, 1660 [the minor’s threat to shoot the victim was “without equivocation or ambiguity” and “sufficiently specific”; “[a]lthough it did not communicate a time or precise manner of execution, section 422 does not require those details to be expressed”].)

One final note: The minor refers, in a footnote in his opening brief, to the Supreme Court’s grant of review in *People v. Chandler* (review granted Feb. 13, 2013, S207542), saying the Supreme Court granted review “on a very similar issue.” There is no similarity. The *Chandler* case involves the question whether the crime of attempted criminal threat requires that it be reasonable under the circumstances for the victim to have been in sustained fear. (See <http://appellatecases.courtinfo.ca.gov> [as of June 27,

9

2014]; S207542.)  That question is completely irrelevant in this case, where there is no doubt the victims "reasonably could have been placed in such fear . . . ." (*Toledo, supra,* 26 Cal.4th at p. 231.)  And in any event, to the extent the minor purports to raise this issue, it is waived for lack of argument demonstrating why the minor thinks it would be helpful to consider the *Chandler* issue.

## 2.    Probation Conditions

The minor challenges two probation conditions imposed by the court as unconstitutionally vague and overbroad, and contends they must be modified to include a knowledge requirement.  We conclude the conditions already include a knowledge requirement, so no modification is necessary.

The juvenile court's oral ruling stated that the minor must "not associate with anyone . . . disapproved of by your parent, probation officer, or school staff," and that the minor must "not have any dangerous or deadly weapon in your possession nor remain in the presence of any unlawfully armed person."  The juvenile court's minute order, however, recited that the minor must "not associate with anyone *known to be disapproved of*" by parents, probation officer, or school, and that the minor must "not have any dangerous or deadly weapon in your possession, nor remain in the presence of anyone *known to minor* to be unlawfully armed." (Italics added.)

The minor contends that the court's oral ruling "trumps the minute order when there is a discrepancy," and therefore we should remand this case to the juvenile court to modify the probation conditions to include an explicit knowledge factor.  The law does not require any such modification in this case, where there is no irreconcilable conflict between the oral ruling and the minute order.

In *In re Byron B.* (2004) 119 Cal.App.4th 1013 (*Byron B.*), the court was presented with exactly the same circumstance.  There, "[t]he juvenile court's oral ruling stated that appellant must '[n]ot have any direct or indirect contact with anyone disapproved by parent, guardian, probation officer or staff.'  Its minute order, however, recited that appellant must '[n]ot have direct or indirect contact with anyone *known to be* disapproved by parent(s)/guardian(s)/probation officer, staff.' " (*Id.* at p. 1015.)

10

On these facts, *Byron B.* ruled: "[U]nlike the juvenile court's oral ruling, its minute order did include the crucial words, 'known to be.' The clerk's minutes and the reporter's transcript are to be harmonized, if possible. [Citation.] In this case, the clerk's transcript simply clarifies a point that the reporter's transcript left ambiguous. We conclude that the minute order correctly recites the juvenile court's ruling. [Citations.] Accordingly, regardless of whether appellant waived his vagueness contention, the probation condition, as stated in the minute order, is not unreasonable, overbroad, or void for vagueness." (*Byron B., supra,* 119 Cal.App.4th at p. 1018; see also *In re Sheena K.* (2007) 40 Cal.4th 875, 891 [observing that several Courts of Appeal, including *Byron B.*, "have recognized that a probation condition that otherwise would be deemed vague may be constitutional because the juvenile court offered additional oral or written comments clarifying that the minor must have knowledge of the persons disapproved of by the authorities"].)

*Byron B.* applies here. Accordingly, whether or not the minor forfeited his vagueness contention, "the probation condition, as stated in the minute order, is not . . . overbroad[] or void for vagueness." (*Byron B., supra,* 119 Cal.App.4th at p. 1018.)

## DISPOSITION

The judgment is affirmed.


GRIMES, J.

We concur:



BIGELOW, P. J.



FLIER, J.


11