Filed 2/6/24  P. v. Cazares CA5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

1FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>MARTIN CAZARES,<br><br>    Defendant and Appellant. | F084553<br><br>(Super. Ct. No. BF188140A)<br><br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Kern County.  Gregory A. Pulskamp, Judge.

Jean M. Marinovich, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Julie A. Hokans and Dina Petrushenko, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Defendant Martin Cazares was convicted of several crimes after he kidnapped his girlfriend and held her captive for eight days.  He was convicted of domestic violence,

kidnapping, two counts of rape (for the same act, but under different theories), making a criminal threat, and dissuading a witness.

He raises four issues on appeal. He contends insufficient evidence supports the great bodily injury enhancements imposed on the rape counts. He also argues insufficient evidence supports his criminal threats conviction. He next contends the trial court abused its discretion in denying his mid-trial request to withdraw his pro per status and have counsel reappointed. Finally, he argues that the single act of intercourse cannot support two rape convictions.

We will reverse the great bodily injury enhancement imposed on the rape count for insufficient evidence and will reject the rest of his claims. We also observe an error in the abstract of judgment which must be corrected.

## STATEMENT OF THE CASE

The Kern County District Attorney filed an amended information charging Cazares with rape by force or violence (Pen. Code,[1] § 261, subd. (a)(2); count 1); rape by threat of retaliation (§ 261, subd. (a)(6); count 2); kidnapping by force or fear (§ 207, subd. (a); count 3); infliction of corporal injury resulting in a traumatic condition upon a person in a dating relationship (§ 273.5, subd. (a); count 4); making a criminal threat (§ 422; count 5); and dissuading a victim or witness (§ 136.1, subd. (b)(1); count 6).

As to counts 1 and 2, it was further alleged that Cazares kidnapped P. (§ 667.61, subds. (d)(2) & (e)(1)) and that he inflicted great bodily injury in the commission of the offense (§§ 667.61, subd. (d)(6)), 12022.8). As to count 4, it was also further alleged that Cazares inflicted great bodily injury in the commission of the offense (§ 12022.7). As to all counts, various California Rules of Court, rule 4.421 sentencing factors were alleged.

A jury convicted Cazares on all counts and found true all enhancement allegations. The trial court sentenced Cazares to a total term of 25 years to life plus eight years as

---

[1] Undesignated statutory references are to the Penal Code.

follows: 25 years to life on count 1, plus five years for the great bodily injury enhancement (§ 12022.8); and the upper term of three years on count 6, ordered to run consecutively to the term imposed on count 1.

The court also imposed a term of 25 years to life plus five years on count 2, stayed under section 654; the upper term of eight years on count 3, stayed (§ 654); the upper term of four years on count 4 plus five years for the section 12022.7, subdivision (e) enhancement, to run concurrently with the term on count 1; and the upper term of three years on count 5, stayed (§ 654).

## FACTS

### I.      Prosecution's case

P. met Cazares when she was 19 years old, and the two dated off and on for five years. P. described their relationship as "complicated" with "lots of ups and downs." There had been "physical" as well as "emotional, mental, and psychological" abuse in their relationship; both were aggressors.

Once, Cazares threatened P. "that if [she] were to leave him or if [she] were to do anything, like call for help, that he would harm [her] or [her] family." Another time, he "burst" into the bathroom while she was showering and punched her so hard in the head that her head "split open" and she bled "everywhere." Some other time he pointed a gun at P. and made jokes that if she ever cheated on him, called the police on him, or "snitch[ed] on him" he would use the gun "against [her] or [her] family." She had called the police on him before and had a restraining order against him.

On November 1, 2021,[2] P. and Cazares went to P.'s mother's house. While there, P.'s stepfather told Cazares he was welcome at their home so long as he did not cause problems. Cazares was upset with P. for not "defending him" to her stepfather.

_____

[2] References to dates are to dates in 2021 unless otherwise stated.

As Cazares drove himself and P. away from P.'s mother's home, he became more upset and suddenly slapped P. in the face. P. tried slapping him back because he had promised he would not hit her anymore. But when she tried, Cazares started "socking" her in the head and face, causing a black eye and split lip. When she nearly passed out, he doused her with a cold drink. P. had broken blood vessels in her eye that lasted for a month, and she had a scar on her temple from where her head hit the car's window. Cazares also punched P.'s puppy, which was in her lap.

After beating P. and seeing her face, Cazares drove to a gas station to buy her Advil. When they got to the station, he told her to stay in the car and keep her head down. He told her "that if [she] were to do something stupid that it would be worse." He also told her that "no matter where [she] would go [he] would find [her]." He locked her in the car and went inside the store, taking her cell phone with him.

When asked at trial what she thought Cazares meant when he told her not to do something stupid or it would be worse, P. said, "All I could think about is that he knows where my family lives and I don't want anything to happen to them because of me." P. also testified that Cazares had previously told her that he knew where her mom lived and where her sister worked. She also stated that he had threatened before to kill her if she ever reported him to the police. She was asked why she did not run from the car when Cazares was in the station. She said she wanted to leave but she had her puppy and did not know where to go.

After leaving the gas station, Cazares drove P. to his sister's house, where he kept her against her will for a week. He kept her phone, her wallet, and her keys the whole time. During that week, he told her she should do nothing "stupid" like try to escape or use his phone while he slept. He also would "swing" a pocketknife and say he was not afraid to use it against her. He made fun of her swollen face and "psychologically torture[d]" her.

4.

Cazares pressured P. during that week to perform oral sex on him and also have vaginal sex. She at first refused to perform oral sex but gave in when he became upset. When she told him at first that she did not want to have sex, he was "threatening" and "exhale[d] deeply or roll[ed] his eyes" at P. She knew from her experience over the course of the relationship that this type of reaction was often followed by "his loss of control," which meant he reacted with "anger and violence" toward her. P. had vaginal sex with Cazares when she saw his reaction because she believed "anger and violence" was coming next and that he would hurt her if she refused. The vaginal sex happened on November 5 or 6.

P. was afraid for her life while Cazares held her hostage at his sister's house. When her family texted, he would direct her replies. Still, P. once managed to text her sister to call 911. Officers came to the house, which "panicked" Cazares. He decided they needed to leave.

The next morning, November 8, Cazares drove P. to Apple Valley and then to a Walmart in San Bernardino, where they slept overnight in the parking lot. The following morning, P.'s phone started receiving messages that she had been reported as a missing person. When Cazares learned about the report, he drove the two of them to Santa Monica. They parked at the beach and stayed in the car. As they sat in the car, a police officer spotted them and Cazares was arrested.

## II.     Defense evidence

A.R. was friends with Cazares on and off for five years and had sex with him twice. In her opinion, he was "kind and generous" and "always respectful" and was never argumentative or forceful. She said he would not try to force sex on anyone. But she acknowledged her opinion of him would change upon proof that he had forced sex on someone.

5.

## DISCUSSION

### I. Great bodily injury enhancement

Counts 1 and 2 charged Cazares with rape based on the single act of vaginal intercourse on November 5 or 6. For each of these counts, the jury found true that Cazares inflicted great bodily injury in the commission of the rape (§ 12022.8). The injury supporting the enhancement was the one inflicted on November 1, when Cazares beat P. until she was nearly unconscious. Section 12022.8 provides a sentence enhancement for inflicting great bodily injury "on a victim in a violation of … paragraph … (2)[ or] (6) of subdivision (a) of Section 261[.]"

Cazares does not dispute that he inflicted great bodily injury. Instead, he contends the injury was not inflicted "in a violation of" section 261, subdivision (a)(2) and (a)(6). The People disagree.

We conclude the section 12022.8 enhancements must be vacated because substantial evidence does not support a finding that the infliction of great bodily injury and the rape were part of one continuous transaction.

### A. Standard of review

The sufficiency of the evidence to support an enhancement is reviewed in the light most favorable to the prosecution, and the appellate court may not reverse the judgment if any rational trier of fact could have found the essential elements of the enhancement beyond a reasonable doubt. (*People v. Carrasco* (2006) 137 Cal.App.4th 1050, 1057.) " 'In assessing the sufficiency of the evidence, we review the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " (*People v. Wilson* (2010) 186 Cal.App.4th 789, 805 (*Wilson*).) But when, as here, consideration of the sufficiency of the evidence also requires construction of the applicable statute, a de novo standard of review is applied along with the usual rules of statutory interpretation. (*People v. Jones*

6.

(2001) 25 Cal.4th 98, 107–108; *People v. Frausto* (2009) 180 Cal.App.4th 890, 897 (*Frausto*).)

###### B.    Analysis

Although couched in terms of substantial evidence, at the heart of defendant's contention is the correct interpretation of a statute, section 12022.8.  Thus, we will first address what "in a violation of" means in the context of section 12022.8.  After establishing the definition, we will turn to whether substantial evidence supports the enhancement.

Again, section 12022.8 provides a sentence enhancement for inflicting great bodily injury "on a victim in a violation of … paragraph … (2)[ or] (6) of subdivision (a) of Section 261[.]"[3]  The question is what "in a violation of" means.  A panel of this court in *People v. Glass* (2004) 114 Cal.App.4th 1032, recognized that "in a violation of" as used in section 12022.8 means in the commission of.  (*Glass*, at p. 1034.)  And the jury was given CALCRIM No. 3160, the pattern instruction for a great bodily injury enhancement.  The instruction requires the jury to determine whether the People have proven that the defendant inflicted great bodily injury "in the commission of" the underlying offense, which in this case was rape.  The parties do not dispute that "in a violation of" means "in the commission of," but the parties disagree on what the latter means.

---

[3] Section 12022.8 reads:  "A person who inflicts great bodily injury, as defined in Section 12022.7, on a victim in a violation of Section 220 involving a specified sexual offense, or a violation or attempted violation of paragraph (2), (3), or (6) of subdivision (a) of Section 261, paragraph (1), (2), or (4) of subdivision (a) of former Section 262, Section 264.1, subdivision (b) of Section 288, subdivision (a) of Section 289, or sodomy or oral copulation by force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person as provided in Section 286 or 287, or former Section 288a, shall receive a five-year enhancement for each violation in addition to the sentence provided for the felony conviction."

Several enhancements apply when a defendant uses a weapon or inflicts great bodily injury "in the commission of" an offense. (E.g., §§ 12022.3 [firearm use or possession], 12022.5 [firearm use], 12022.53, subds. (b)–(d) [firearm use], 12022.7 [great bodily injury]. "[I]dentical terms in analogous statutes are to be construed in like manner." (*Frausto, supra,* 180 Cal.App.4th at p. 899.)

In *Frausto, supra,* 180 Cal.App.4th 890, the court held that a firearm is discharged "in the commission of" a felony within the meaning of section 12022.53, subdivision (d),[4] "if the underlying felony and the discharge of the firearm are part of one continuous transaction, including flight after the felony to a place of temporary safety." (*Id.* at p. 902.) In reaching this conclusion, the court held "that the phrase 'in the commission of' in section 12022.53[, subdivision] (d), has the same meaning as identical or equivalent language in sections 667.61, 12022.3, and 12022.5 and the felony-murder statutes." (*Id.* at p. 902.) Applying that construction, the court concluded that where a defendant was convicted of one count of murder and two counts of attempted murder, the death of one victim supported imposition of the subdivision (d) enhancement with respect to the attempted murder of the other two victims because "[a] reasonable trier of fact could find that the shootings were part of one continuous transaction." (*Id.* at p. 903.)

Applying *Frausto*'s holding here, we conclude that a defendant inflicts great bodily injury "in a violation of" an offense within the meaning of section 12022.8 if the underlying felony and the infliction of the great bodily injury are part of one continuous transaction. We turn next to whether substantial evidence supports a finding here that the infliction of great bodily injury and the rape were part of one continuous transaction.

---

**4** Section 12022.53, subdivision (d), stated in relevant part at the time of *Frausto*: "Notwithstanding any other provision of law, any person who, in the commission of [attempted murder] personally and intentionally discharges a firearm and proximately causes great bodily injury … or death, to any person other than an accomplice, shall be punished by an additional and consecutive term of imprisonment in the state prison for 25 years to life." (*Frausto, supra,* 180 Cal.App.4th at p. 896.)

*People v. Malone* (1977) 72 Cal.App.3d 649 (*Malone*), demonstrates that substantial evidence does not support the section 12022.8 enhancement here. *Malone* involved similar facts and was decided on reasoning consonant with our construction of section 12022.8. There, the defendant picked up a prostitute, pointed a gun at her, and drove her to a drive-in where he forced her to orally copulate him. (*Id.* at p. 652.) During the trip and during the drive-in incident, defendant hit the victim several times, tied her hands with a cord, and burned her back with a cigarette. (*Ibid.*) After leaving the drive-in, defendant drove to a restaurant where they had soft drinks. (*Ibid.*) As they left the restaurant, defendant ordered the victim to give him $5 from her purse, which she did. (*Ibid.*)

The defendant was convicted of kidnapping, oral copulation, and robbery, and was found to have inflicted great bodily injury in the commission of the robbery. (*Malone, supra,* 72 Cal.App.3d at p. 652.) He challenged the great bodily injury enhancement on appeal, arguing that the great bodily injury was inflicted in the course of the kidnapping and sexual assault, not in the course of the robbery. He contended "that the robbery came after those offenses and the infliction of the injuries was, thus, not 'in the course of commission of the robbery.' " (*Id.* at p. 656.) The Court of Appeal agreed, explaining, "Although [the victim] testified that she gave defendant the $5 in fear that he would repeat the earlier injuries, there is no evidence that he did inflict any injury in carrying out the robbery." (*Ibid.*)

In *Malone*, as here, the infliction of the great bodily injury was not part of one continuous transaction with the offense it was attached to. Both here and in *Malone*, there was a significant break in the action between the infliction of the injury and the underlying offense. And the break here was much longer than the one in *Malone*. Here, the infliction of the injury and the rape were separated by four or five days. The injury occurred in the car the evening of November 1. The rape did not occur until November 5

9.

or 6. True, P. remained continuously captive during that time. But the infliction of the injury and the rape were not part of the same continuous transaction.

Since insufficient evidence supports the sections 12022.8 enhancements, they must be vacated.

## II. Criminal threats conviction

Cazares contends insufficient evidence supports his criminal threat conviction. The conviction was based on a statement he made to P. on November 1, when they were at the gas station. Cazares drove P. in P.'s car to the convenience store to buy her Advil after beating her and injuring her face and eye. When he got to the store, he told P. to stay in the car and said "that if [she] were to do something stupid that it would be worse."

To establish the offense of making criminal threats under section 422, subdivision (a), the prosecution must prove: " '(1) that the defendant "willfully threaten[ed] to commit a crime which will result in death or great bodily injury to another person," (2) that the defendant made the threat "with the specific intent that the statement ... is to be taken as a threat, even if there is no intent of actually carrying it out," (3) that the threat—which may be "made verbally, in writing, or by means of an electronic communication device"—was "on its face and under the circumstances in which it [was] made[ ] ... so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat," (4) that the threat actually caused the person threatened "to be in sustained fear for his or her own safety or for his or her immediate family's safety," and (5) that the threatened person's fear was "reasonabl[e]" under the circumstances.' " (*In re George T.* (2004) 33 Cal.4th 620, 630 (*George T.*).)

Cazares contends the evidence was insufficient to allow the jury to conclude his statement to P. was sufficiently "unequivocal, unconditional, immediate, and specific" so as to convey a gravity of purpose and immediate prospect of execution. We evaluate this

challenge under the substantial evidence test. (*Wilson, supra,* 186 Cal.App.4th at p. 805.) We conclude substantial evidence supports the conviction.

Cazares contends his statement that "it would be worse" was vague, though admittedly "somewhat menacing." But even if Cazares's telling P. not "to do something stupid" or "it would be worse" were vague or ambiguous, a reasonable jury could find this statement sufficiently "unequivocal, unconditional, immediate, and specific" to constitute a criminal threat. (*George T., supra,* 33 Cal.4th at p. 635.)

"A communication that is ambiguous on its face may nonetheless be found to be a criminal threat if the surrounding circumstances clarify the communication's meaning." (*George T., supra,* 33 Cal.4th at p. 635; *In re Ryan D.* (2002) 100 Cal.App.4th 854, 860 [" '[I]t is the circumstances under which the threat is made that give meaning to the actual words used' "].) "[A]ll of the surrounding circumstances should be taken into account[.] This includes the defendant's mannerisms, affect, and actions involved in making the threat[.]" (*People v. Solis* (2001) 90 Cal.App.4th 1002, 1013.) " 'The parties' history can also be considered as one of the relevant circumstances.' " (*People v. Butler* (2000) 85 Cal.App.4th 745, 754.)

As to his statement not "to do something stupid" or "it would be worse," Cazares says the relevant question is: "worse than what?" He contends no evidence links the statement "it would be worse" to a threat of death or great bodily injury. We disagree. The circumstances clarified Cazares's words as a threat. Cazares said these words soon after beating P. about the head and face until she was nearly unconscious. She was "dozing off" after being struck in "head, face, [and] eyes" when he dumped a cold drink on her to wake her up. She had an injured eye and split lip. These injuries, in the jury's

11.

view, constituted great bodily injury.[5]  The jury could reasonably find that the words "it would be worse" meant something worse than the great bodily injury she just received.

Cazares stresses that when P. was asked at trial what she thought he meant by "it would be worse," she did not reference being beaten; instead, she referenced only fear that something would happen to her family.  She said, "All I could think about is that he knows where my family lives and I didn't want anything to happen to them because of me."  He contends this shows his statement was not so unequivocal, unconditional, immediate, and specific to constitute a criminal threat.  But that is not all P. testified to concerning her fear in response to that threat.  She said that he told her that "no matter where [she] would go [he] would find [her]."  She also stated she recalled Cazares saying before that he knew where her mom lived and sister worked.  She also recalled that Cazares had told her before that he would kill her if she ever reported his conduct to police.  Also, when asked why she did not run when Cazares went into the store to buy the Advil, she said she "wanted to leave [the] car" but she had her puppy with her and "didn't know where to go."  Even though P. did not expressly testify that she feared death or great bodily injury had she tried to escape the car, the jury could reasonably infer as much from the circumstances.  The jury could infer that P. feared that if she fled the car, Cazares would pursue her and inflict at least great bodily injury on her if he caught her; and if he could not track her down, he would inflict at least great bodily injury on one of her family members.

One of the facts Cazares overlooks in his analysis is the simple fact that P. remained in the car like Cazares told her to.  If his words really were not a threat, then why did she not just follow him into the store and ask for help?  The jury could readily infer the answer:  because the threat scared her.

---

[5] Recall that the jury found true the great bodily injury enhancement allegations in connection to counts 1 and 2 based on these injuries.

12.

We conclude that the jury reasonably could infer that Cazares's telling P. not "to do something stupid" or "it would be worse" was sufficiently "unequivocal, unconditional, immediate, and specific" to constitute a criminal threat.

## III.     Motion to withdraw pro per status and reappoint counsel

Cazares next contends the trial court erred in refusing his request, made after trial began, to withdraw his pro per status and to have counsel reappointed.  We disagree.

### A.     Additional facts

Cazares was arrested on November 8, and the initial complaint was filed November 24.  He was arraigned on November 30, and the public defender was appointed to represent him that day.  He pled not guilty.  A preliminary hearing was set for December 10, with a pre-preliminary hearing set for December 9.

*December 9—Waiver of right to counsel*

On December 9, Cazares signed a five-page long form entitled "Advisement and Waiver of Right to Counsel."  The form stated it served as a "*Faretta*[6] Waiver."  The form advised Cazares of his constitutional rights as an accused person and of the dangers and disadvantages of self-representation, and also contained the court's advice and recommendation against self-representation.  The form required Cazares to initial in 25 places and to sign and date at the bottom.

Some of the dangers and disadvantages contained in the form included:

"A.  I understand that if I am permitted to represent myself it will be necessary for me, WITHOUT THE ASSISTANCE OF A LAWYER OR THE COURT, to follow all the technical rules of substantive law, criminal procedure, and evidence.

"[¶] … [¶]

"C.  I understand that if I am permitted to represent myself, it will be necessary for me WITHOUT THE ASSITANCE OF A LAWYER, to conduct my own trial consisting of, but not limited to:  making pretrial motions; selecting a jury; making an opening statement; cross-examining

---

[6] *Faretta v. California* (1975) 422 U.S. 806 (*Faretta*).

13.

the witnesses for the prosecution; subpoenaing and presenting my own witnesses; making appropriate objections and motions during the course of the trial; preparing and presenting proposed jury instructions to the Court; making the final argument; making appropriate motions after trial; representing myself at the time of the probation and sentencing hearing in the event of conviction.

"D.  I understand that I cannot and will not receive any help or special treatment from the Court.

"[¶] … [¶]

"G.  I understand that no continuance will be allowed without a showing of good cause, and that such requests made just before trial will most likely be denied.

"H.  I understand that depending on the stage of my case, if I ask to give up my pro per status and request counsel to handle my case, the Court may deny this request and I may have to proceed with trial without an attorney."

The court's advice and recommendation in the form included:  "I understand that it is the advice and recommendation of this Court that I do not represent myself and that I accept court-appointed counsel."

The court held a hearing on Cazares's *Faretta* motion on December 9.  The court asked Cazares if he understood all the tasks he would be responsible for performing for himself in connection with the trial, including giving an opening statement.  When the court asked him if he could be prepared to give an opening statement, Cazares said, "Well, yeah, with the right preparation, I mean, anybody can do anything."  The court also emphasized that Cazares would not receive any special treatment or indulgences from the court, and Cazares said he understood.  The court also bluntly told Cazares: "You are going to be detrimental to your case."  The court also told Cazares he would not have "standby counsel."

Cazares made clear that the reason he wanted to represent himself is that he "just want[ed] a speedy trial."  After a lengthy discussion with the court, Cazares affirmed he

wanted to represent himself.[7]  The court granted his request, finding Cazares had knowingly and understandably given up his right to be represented by counsel.

The same day, the preliminary hearing set for the next day was trailed to December 14.

### *December 14—Cazares withdraws his Faretta waiver*

On December 14, Cazares moved to withdraw his pro per status and have counsel reappointed, which the court granted.  The public defender represented Cazares during his preliminary hearing on January 25, 2022.

Cazares was arraigned on the information on February 15, 2022.  That day, the public defender declared a conflict of interest, and the case was reassigned to an attorney from the independent counsel panel.  Trial was set that day for April 4, 2022.

### *April 4, 2022—Cazares moves again to represent himself*

On April 4, 2022, Cazares's attorney said he did not have all the discovery and needed at least 30 more days to be ready for trial.  However, his attorney informed the court that Cazares did not want to wait for his counsel to get ready and wanted to represent himself.

The court stated it had received a *Faretta* waiver form from Cazares, which Cazares signed and dated April 4, 2022.  The court told Cazares:  "Let me go through this form.  You filled out a form regarding the right to have counsel."  Cazares confirmed he filled out, read, and signed the form.  The form was very similar to the one Cazares signed on December 9, 2021; it required Cazares to initial many paragraphs and contained an extensive explanation of the dangers and disadvantages of self-representation, as well the court's advice and recommendation against self-representation.

---

[7] This hearing on the *Faretta* motion comprises 34 pages of the reporter's transcript.

15.

The court told Cazares he was putting himself at a disadvantage by going up against an experienced prosecutor, and Cazares said he understood that. The following colloquy took place:

"THE COURT: You understand that the court is advising you not to act as your own attorney?

"[CAZARES]: Yes, ma'am.

"THE COURT: In spite of all that, you still want to act as your own attorney?

"[CAZARES]: Absolutely.

"THE COURT: What is the reason you want to be your own lawyer?

"[CAZARES]: Because lots of reasons, but mainly because I feel like the P.D. and IDP has a whole little process. You guys, not you, I guess you're saying we have the right to speedy trial, but you guys purposely give different lawyers and you guys keep switching them.

"THE COURT: The main thing is the delay of your hearing getting started?

"[CAZARES]: Yes.

"THE COURT: Instead of waiting to have a lawyer be assigned or get ready, you could just do it yourself?

"[CAZARES]: Yes.

"THE COURT: I understand your impatience and I understand when a lawyer conflicts off and a new lawyer comes on, they need to be ready. I want you to be aware if you're not successful in defending yourself, you're looking at a lot of time on those charges.

"You have a right to be your own attorney if you want. It is kind of a gamble, because he doesn't want to wait a minute for them to be ready.

"[CAZARES]: Yes.

"THE COURT; But you still want to do it yourself.

"[CAZARES]: Yes, ma'am.

"THE COURT: You signed this form, right?

"[CAZARES]: Yes, ma'am."

The court then relieved Cazares's appointed counsel and allowed him to represent himself. The court then asked Cazares if he was ready for trial, and Cazares said he was. The court told Cazares his trial had to start by April 18, 2022, unless he waived time.

### April 18, 2022—Trial begins

On April 18, 2022, the case was assigned to Judge Gregory A. Pulskamp's department for trial. Judge Pulskamp acknowledged it was the last day for trial and asked Cazares if he stipulated that trial has started "for all purposes including speedy trial issues." Cazares responded: "I don't know. I just want the trial to start immediately." The court then asserted it would begin the trial that afternoon with jury selection. Jury selection began that afternoon.

### April 19 and 21, 2022—Cazares asks for counsel to be reappointed

In the morning on April 19, 2022, the court addressed pretrial matters and ruled on motions in limine. The court was to continue with jury selection in the afternoon session that day. The afternoon session began with the court acknowledging the prosecution had filed an amended information—the operative information here.

Cazares then asked the court if he could be provided "co-counsel." The court said no, stating that Cazares had once before moved to represent himself and then changed his mind and moved to reappoint counsel, and again moved to represent himself and was now seeking to again reappoint counsel. The court stated it "trust[ed]" that the proceedings on Cazares's *Faretta* motion were "thorough." The court said it would not reappoint counsel at that time on Cazares's oral motion but welcomed Cazares to file a written motion containing "some authority" and "explain[ing] a little bit more about [his] request[.]" The court said, "I mean, you had an attorney. You said you didn't want them. You wanted to go forward without them. I'm not going to give you an attorney now one day into trial." The trial proceeded with jury selection.

Jury selection continued on April 20, 2022. On April 21, 2022, with jury selection still underway, Cazares moved to withdraw his pro per status. The motion was about half

a page long, handwritten, and cited no authority. The motion asserted Cazares was not effectively representing himself but did not explain how.

The court heard argument on the motion on the morning of April 21, 2022. The court began by stating that the motion seemed to be "almost like setting up some appellate issue." The court told Cazares: "I don't really appreciate, Mr. Cazares, you flopping back and forth with your attorney. It's almost like you are trying to create some issue and play some games to me but that's just my perspective." The court then continued the hearing to the afternoon that day and said it would check on the availability of Cazares's most recent attorney.

That afternoon, Cazares's prior attorney was present in court. Counsel said he would not be ready for trial for at least 45 days. The court had its clerk inquire of the managing attorney of the conflict panel if a different attorney could be appointed who would be ready to try the case by May 2, 2022, and the response was that no other attorney could be ready "within a reasonable period of time."

The court then heard argument from the parties on the motion. Cazares began, "Well, I really don't understand much of what is going on as far as the court proceedings…. So I—I just don't know pretty much how to represent myself like I thought I would." The prosecutor responded that she believed Cazares's motion "[was] an attempt to manipulate the system" and asserted granting the motion would cause "a significant disruption or delay[.]" When the court asked Cazares if he had any final comments, he offered: "I don't understand really what—what I was getting myself into."

The court denied Cazares's motion and thoroughly explained its reasoning. First, the court found there was "no substantial change in circumstances" since Cazares's *Faretta* waiver made on April 4, 2022. The court also found it significant that Cazares had made two *Faretta* motions. The court stated that this meant that the risks and responsibilities of self-representation were twice explained to him "very clearly and thoroughly." The court also stated it had reviewed Cazares's second *Faretta* waiver form

18.

and found it to be "very complete, thorough, and comprehensive[.]" The court further found that the fact that Cazares's prior attorney could not be ready for 45 days would cause "very substantial delays." The court also noted that they were already four days into trial. Finally, the court found that Cazares had been "doing a satisfactory job" in representing himself. The court told him, "[Y]ou're not doing a bad job. You are competent."

## B. Analysis

A criminal defendant has the right under the Sixth and Fourteenth Amendments to waive the right to counsel and to represent himself. (*Faretta, supra,* 422 U.S. at p. 819.)

"When a criminal defendant who has waived his right to counsel and elected to represent himself under *Faretta* … seeks, during trial, to revoke that waiver and have counsel appointed, the trial court must exercise its discretion under the totality of the circumstances, considering factors including the defendant's reasons for seeking to revoke the waiver, and the delay or disruption revocation is likely to cause the court, the jury, and other parties." (*People v. Lawrence* (2009) 46 Cal.4th 186, 188 (*Lawrence*).)

In exercising that discretion, the trial court may consider these factors: " '(1) defendant's prior history in the substitution of counsel and the desire to change from self-representation to counsel-representation, (2) the reasons set forth for the request, (3) the length and stage of the trial proceedings, (4) disruption or delay which reasonably might be expected to ensue from the granting of such motion, and (5) the likelihood of defendant's effectiveness in defending against the charges if required to continue to act as his own attorney.' " (*People v. Gallego* (1990) 52 Cal.3d 115, 164.) Even so, as stated in *Lawrence*, "[U]ltimately the trial court's discretion is to be exercised on the totality of the circumstances, not strictly on the listed factors." (*Lawrence, supra,* 46 Cal.4th at p. 192.) Also, "The standard is whether the court's decision was an abuse of its discretion under the totality of the circumstances [citation], not whether the court

correctly listed factors or whether any one factor should have been weighed more heavily in the balance." (*Id.* at p. 196.)

In *Lawrence*, "the revocation request by defendant, who was being tried jointly with a codefendant, was not heard until after the jury had been selected and sworn and the prosecution's first witness had begun to testify." (*Lawrence, supra,* 46 Cal.4th at p. 188.) The court held, "considering all the circumstances, especially defendant's failure to articulate a compelling reason for revoking his *Faretta* waiver and the likely delay and disruption that continuing a joint trial after the jury was empaneled would cause, the trial court did not abuse its discretion in denying the revocation request." (*Id.* at p. 188.) The *Lawrence* court elaborated on its reasoning, "That defendant was told of—and affirmed his understanding of—the risks and disadvantages of self-representation before he waived counsel reflected on his reasons for later seeking to revoke the waiver. The colloquy tended to show not that he had suddenly learned he would be at a disadvantage in the trial, but that … he had simply reweighed the pros and cons of self-representation and changed his mind as to the best course." (*Id.* at p. 195.) Moreover, "As far as the record shows, defendant was not trying to manipulate the system or create an issue for appeal in making his request to revoke in propria persona status. Nevertheless, he had no compelling reason to do so, and granting his request would likely have caused serious disruption to the administration of justice, considerations strongly supporting denial." (*Id.* at p. 196.)

Like the *Lawrence* defendant, Cazares showed no compelling reason to revoke his in pro per status. In fact, he did not even try to articulate a compelling reason. He did nothing more than vaguely assert that he did not feel like he was representing himself effectively, that he did not "understand much of what [was] going on," and that he did not understand what he was "getting [him]self into." He did not explain what exactly he did not understand or what exactly he was incapable of doing. As to not knowing what he was getting himself into, he failed to show that any aspect of the proceedings proved to

20.

be harder to manage than he expected or that any aspect of the proceedings had surprised him. In other words, the record does not show "that he had suddenly learned he would be at a disadvantage in the trial." (*Lawrence, supra,* 46 Cal.4th at p. 195.) The court gave Cazares an ample opportunity to state reasons for his request to withdraw his pro per status, and Cazares offered essentially nothing.

Additionally, as the trial court noted, Cazares had twice moved to represent himself. Both times he was expressly told in his *Faretta* waiver forms and by the judges who ruled on the motions that self-representation is ill advised. There is no question he was fully apprised of how difficult representing oneself is. He was also informed in both waiver forms that depending on the stage of the case, if he asked to give up his pro per status and requested counsel, the court could deny this request.

Cazares's requests were also very untimely. He orally requested co-counsel on the second day of trial and filed his half-page written motion on the fourth day. The parties were in the middle of jury selection and had completed motions in limine. The trial would have had to have been continued at least 45 days for his prior counsel to get ready. So not only was his request late, granting it would have resulted in a substantial delay.

Weighing all of these considerations, we cannot conclude the trial court abused its discretion in denying Cazares's request to withdraw his pro per status and have counsel reappointed. The most significant consideration is that Cazares articulated no reasons at all for his request, let alone good ones. It appears "he had simply reweighed the pros and cons of self-representation and changed his mind as to the best course." (*Lawrence, supra,* 46 Cal.4th at p. 195.)

## IV. Multiple rape convictions

Cazares was convicted of two counts of rape based on a single act of intercourse. He was convicted of violating section 261, subdivisions (a)(2) [rape by force or fear] and (a)(6) [rape by threatening to retaliate]. Citing section 954, he contends he has impermissibly suffered multiple convictions for different statements of the same offense

21.

based on the same act.  He argues section 261 creates only one offense with alternative means of proof; it does not create separate offenses.  He thus asserts his conviction on one of the rape counts must be vacated.  But he acknowledges this court must reject this contention in light of the Supreme Court of California's decision in *People v. White* (2017) 2 Cal.5th 349.  (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 456.)  There, the Court held that section 261's subdivisions describe different offenses, and defendant may properly be convicted of, although not punished for, both.  (*White,* at pp. 357–359.)  Cazares raises this issue only to preserve it for Supreme Court review.

## V.     Abstract of judgment

The People identify an error in the abstract of judgment which must be corrected. The abstract for the indeterminate portion of Cazares's sentence fails to indicate in item 8 that he was sentenced pursuant to section 667.61.

## DISPOSITION

We vacate the great bodily injury enhancement findings (§ 12022.8) on counts 1 and 2.  We order the abstract of judgment be amended to reflect the vacation of those enhancement findings and to reflect that Cazares was sentenced under section 667.61. The superior court shall send copies of the amended abstract of judgment to all appropriate entities.  In all other respects, the judgment is affirmed.

SNAUFFER, J.

WE CONCUR:

LEVY, Acting P. J.

PEÑA, J.

22.